Taylor *v.* Steamboat Robert Campbell.

TAYLOR, Defendant in Error, *vs.* STEAMBOAT ROBERT CAMP-BELL, Plaintiff in Error.

1. Under our act, (R. C. 1845,) a party may proceed against a boat by name, for the non-performance of a contract made by her master, upon a trip up the river, for the transportation of freight upon the return trip.
2. One partner may sue for the breach of a contract made by him in his own name, although it was made for the benefit of the firm.
3. A. sued a boat for the non-performance of a contract made by her master by telegraph. It was proved that A. sent a dispatch to the boat, which was delivered to her officers. *Held*, a dispatch purporting to come from the master in reply might *go to the jury* upon proof that it was delivered in the telegraph office, without express proof that it was sent by the master, or with his consent.
4. It is no defence for a party, who is sued for the breach of a contract to transport a specific number of articles, with which he did not offer to comply, that the plaintiff did not have as large a number as was specified ready for transportation.
5. A telegraphic dispatch from a boat on the Missouri river agreeing to transport freight, without naming the point of destination, may go to the jury as evidence of a contract to transport to *St. Louis.*
6. (*Collier* v. *Swinney*, 16 Mo. Rep. 484, affirmed.)

### *Error to Cooper Circuit Court.*

This was an action against the steamboat Robert Campbell, for the non-performance of a contract of affreightment.

The petition stated that William Edds, master of the boat, on the 12th of December, 1852, agreed, on behalf of the boat, to transport 400 hogs of the plaintiff, from Boonville, on the Missouri river, to St. Louis, at fair rates, and failed to comply with the contract.

The master answered on behalf of the boat, denying that he made the contract set forth in the petition, alleging that the plaintiff did not have 400 hogs ready to be shipped on said boat in pursuance of the supposed contract, and further alleging that, on account of low water and ice, it was impossible for the boat to have complied with the contract, if any such had been made.

At the trial, the telegraph operator at Boonville testified that the plaintiff delivered in his office the following dispatch, which was forwarded to Lexington on the day of its date :

"Boonville, December 11, 1852.
"To Robert Campbell :
"Make room for 400 hogs at fair rates.
"WM. TAYLOR."

The operator at Lexington testified that the above dispatch was received at his office on the day of its date, and on the same day "delivered to the officers of the steamboat, Robert Campbell;" and that on the next day, the following dispatch was deposited in his office and forwarded to Boonville :

"Lexington, December 12.
"Will take your hogs.   Be down to-morrow morning.
"CAPT. EDDS."

Upon this testimony, the plaintiff was permitted to read the dispatches in evidence to the jury, notwithstanding an objection by the defendant.

John Taylor testified that he and his brother, the plaintiff, were in partnership; that, on the 11th of December, 1852, they had 370 hogs at Boonville, which they had purchased on joint account, and intended shipping to be sold on joint account as partnership property ; that he had refused to join in a suit against the boat, but expected to share the expenses and benefits, if any resulted from the suit.

It was in evidence that the Robert Campbell passed Boonville, on her downward trip, on the 13th of December, 1852, without attempting to land, and that she was the last boat down during that month.   There was evidence that, on account of ice in the river, it would have endangered the safety of the boat to have taken 370 hogs on board, and evidence to the contrary.   The plaintiff introduced evidence to fix the amount of damage he had sustained by the failure of the boat to take the hogs.

The court left it to the jury to determine whether there was a contract, and directed them that the boat would not be excused for a failure to comply with her contract by the low water or ice.

The following instructions asked for the defendant were refused :

1. If the jury find from the evidence, that the plaintiff did

not have 400 hogs ready to be shipped at Boonville as the boat passed down, they must find for the defendant.

2. If the hogs belonged to plaintiff and John Taylor jointly, and they were in partnership in the same, then the jury must find for defendant.

3. There is no evidence that the steamboat Robert Campbell, by and through the master thereof, made the contract set forth in the plaintiff's complaint, and the jury must therefore find for the defendant.

4. If it would have endangered the life of the boat to have taken the hogs at the time she passed down, on account of ice and the stage of water, then the boat was excused from taking the hogs at that time.

The plaintiff obtained a verdict for $600, and the defendant sued out this writ of error.

*W. Adams*, for plaintiff in error. I. The telegraphic dispatch signed, " Capt. Edds," was improperly read in evidence, 1, because no proof was given that Edds, the master, signed the same or authorized it to be sent, and 2, because the dispatch itself, or taken in connection with the other testimony, was no evidence of any contract, much less of the contract set forth in the complaint. II. There was no proof whatever of a contract to transport hogs from Boonville to St. Louis. III. There were only 370 hogs at Boonville, and they were partnership property, belonging to plaintiff and his brother jointly. If there was any contract, it was a joint contract, made with the plaintiff and his brother; and 370 hogs would not satisfy a contract for 400, nor could the suit be brought in the name of the plaintiff alone. (New Practice Act.) IV. Even if there had been a contract, as alleged, it was not such a contract as would authorize a suit against *the boat.* The fourth clause of the first section of the act concerning " boats and vessels" only applies to cases where an actual bailment has been made, and not to contracts made by the master or owner to receive and transport goods at a future time. V. The obstruction of navigation by ice is an act of God, which excuses

Taylor *v.* Steamboat Robert Campbell.

the non-performance of a contract of affreightment. VI. The master of a boat, as such, has no power to bind even the owners by a contract for the future reception and transportation of freight; much less can he make a contract of that kind so as to create a lien on the boat under the statute. (Story on Agency, §121. 20 Ohio Rep. 54.)

*J. W. Morrow* and *J. B. Gardenhire*, for defendant in error. I. John Taylor was not a necessary party. He was no party to the contract, and if he had joined, there would have been a variance between the contract set out and the proof. He was a dormant partner and was properly omitted. (2 Taunt. 326–7. 8 Serg. & Raw. 54. 6 Pick. 352. 3 Maine, 416. 3 Cow. 85.) He would not consent to be made a party, and therefore was properly omitted. (Story's Eq. Pl. §167, note 3. 11 Vesey, 313.) A complete determination of the controversy can, for this reason, be had without him. (New Practice Act, art. 3, secs. 7 and 10. 19 Vesey, 457.) The objection, not being taken by answer, is waived. (New Practice Act, art. 6, sec. 6.) II. There were facts and circumstances in evidence *tending* to prove the making of the contract set out in the petition, and they were properly submitted to the jury. (Cow. & Hill's notes, part 2, p. 1310 and authorities cited.) The transmission of messages by telegraph is a new and great element in the transaction of commercial business. Contracts are made every day for large amounts through its means; and if the strict rules of evidence are to be applied to such contracts, its utility will be greatly diminished. III. As the defendant, by his own contract, assumed the obligation to take the hogs, the act of God will not excuse him for a failure, because he might have made the proper exceptions, if he had chosen. (Story on Contracts, §668. 16 Mo. Rep. 467.)

SCOTT, Judge, delivered the opinion of the court.

This was an action brought by the defendant in error against the steamboat Robert Campbell, for the non-performance of a contract of affreightment.

Taylor, v. Steamboat Robert Campbell.

1. One of the points made in the cause is, that a proceeding against a boat *in rem* for the non-performance of the contract, the subject matter of this suit, is not within the statute; that the captain of a boat cannot make future contracts for the transportation of freight, and that the only remedy for the breach of such contracts is, an action against the owners of the boat, as the statute was designed to render the boat itself subject to process, only in those cases in which the freight had actually been received on board.

Opinions of judges in other states were cited in support of this view of the subject. But it did not appear that the statutes in those states were entirely similar to our own. Questions of this kind depend, for their solution, on the words of the law, and it is obvious that opinions based on statutes varying from ours, can have but little weight. Our law creates a lien, and gives an action against a boat, for all demands or damages accruing from the non-performance or mal-performance of any contract of affreightment, or of any contract touching the transportation of persons or property. These words are sufficiently comprehensive to embrace a neglect or refusal to comply with a contract of affreightment, or for the transportation of property. The construction contended for would render the word "non-performance" inoperative, as all the cases claimed to be within the statute would be covered by the word, "malfeasance." We will not undertake to determine how far the captain is authorized to make future contracts binding the boat, but it is obviously for the interest of the owners of boats that captains, in their voyages up a stream, should have power to make contracts to take freight on their return. The denial of such a power would operate injuriously to the boats themselves, as, without a contract, many would be unwilling to take their produce to the river for transportation. It is not an easy matter to ascertain who are the owners of a steamboat, and, when the owners are ascertained, they are usually found to reside at places remote from those at which their boat is employed; hence the law for the benefit of those who deal with boats has al-

lowed an · attachment against them for certain enumerated wrongs.

2. The hogs to be transported belonged to the plaintiff and John Taylor in partnership. Now, a contract made by an agent, in his own name, may be sued on by the agent; for it is a general rule that, wherever an express contract is made, an action is maintainable upon it, either in the name of the person with whom it was actually made, or in the name of the person with whom, in·point of law, it was made. ( *Cothay* v. *Fennell*, 21 E. C. L. 146.) The property belonging to partners, a contract made respecting it would, in point of law, be a partnership contract, and suit upon it would properly be brought in the names of the firm. But, as this contract was made in the name of one partner, there is no principle of law which prohibits an action on it in the name of him alone by whom it was made. A mere agent, as we have seen, may sue on a contract made in his own name; *a multo fortiori*, the same thing can be done by a partner. If this matter stood as at common law, the foregoing would be the principles, it is conceived, by which the parties would be governed in the institution of a suit on this contract. Now, as the statute has made other parties necessary, as advantage was not taken of that omission in the way and at the time pointed out by law, no exception could be taken at the trial for the want of proper parties. (Practice Act, art. 6, sec. 6.) Nor was there any variance, as the contract proved corresponded with that stated in the petition.

3. The evidence presents a new question, and one of some importance to business men, in relation to the manner in which the execution of a contract, made through the medium of a telegraph, is to be proved. It is not expected, when men contract by telegraph, that they are afterwards to be bound or not, as their passions or interests may dictate. Such contracts must be regarded as binding and obligatory as if made in the ordinary way. Private communications relative to business, made by means of a telegraph, are usually relied on, and that reliance has not proved unfounded. When men consent to use the tel-

egraph for the purpose of making an agreement, there is no hardship in submitting to a jury, as evidence of their consent to such an agreement, those facts and circumstances which are received by and acted on by mankind, in communicating through that medium. Here, the defence does not turn on any imposition or forgery on the part of the agents of the telegraph; but the plaintiff, by the pleadings, is put to the proof of the contract on which he has sued. The evidence is ample to show that a communication was made by the plaintiff to the defendant; but the difficulty arises in showing that the answer to that communication was from the agent of the defendant. The telegraphic agent testifies that the dispatch received from the plaintiff was delivered to the officers of the steamboat Robert Campbell, and a dispatch in answer to that of the plaintiff was deposited in his office to be forwarded to the plaintiff, which was done on the next day. If, under such circumstances, any person had received a dispatch in answer to one forwarded by him, he would not have failed to act upon it. His conduct would have been based upon the faith usually given to the correctness and fidelity with which such business is transacted by the agents of the telegraph. For these reasons, we are inclined to the opinion that the evidence offered by the plaintiff was sufficient to permit the dispatch to be read to the jury, who would then, from all the circumstances, determine whether it was the act of the master of the boat.

4. We do not consider that the principle which makes entire a contract for the delivery of a number of specific articles, and which relieves a vendee from the obligation of receiving a part of them as having any application under the facts of this case. Had the defendant refused to receive a less number of hogs than that stipulated, then the question, whether the number offered was a substantial compliance with the contract, would have arisen. Had less than the stipulated number been refused, other hogs might have been obtained, or the plaintiff might have been willing to have paid freight for the number agreed upon, in order that those on hand might have been transported to market.

5. Considering the medium through which the contract was made, and the fact that St. Louis is the great mart of this state, and that all boats on the Missouri river make that place their destination, we are of the opinion that the dispatches sufficiently show that a contract of affreightment for four hundred hogs to St. Louis was intended by the parties. Had any other port than St. Louis been contemplated, the contract could not have been sustained. When a boat on the Missouri river agrees to take freight, every one understands the place to which it is to be carried.

6. It may be answered to the objection that the boat was prevented by ice from complying with her contract, that this case falls within the principle of that of *Collier* v. *Swinney*, (16 Mo. Rep. 484.)

Judge Ryland concurring, judgment affirmed.