## THE J. F. WARNER.

*(District Court, E. D. Michigan.   February 5, 1883.)*

1. ADMIRALTY JURISDICTION — CONTRACT OF AFFREIGHTMENT — LIBEL IN REM FOR BREACH.

    In cases of breach of contract of affreightment a libel will lie *in rem* against the vessel and *in personam* against her owner.

2. SAME—SUIT IN PERSONAM—STATE LAW GIVING LIEN.

    While a court of admiralty will not entertain a suit *in rem* for the breach of a purely executory agreement because no lien is given by the law maritime, yet it has jurisdiction *in personam* of this class of cases, and where a state law has annexed a lien to such contracts a court of admiralty will enforce it.

In Admiralty.

This was a libel for breach of a contract of affreightment made at Buffalo, New York, July 31, 1879, between the libelant, Bewick, and respondent Walker, then master and part owner of the barge J. F. Warner.   The libel was *in rem* against the barge and *in personam* against her owners.   The libel set forth that on July 31, 1879, Bewick chartered the barge Warner to go from Buffalo to Alpena and transport a cargo of 340,000 feet of lumber, at $1.50 per thousand, which she was to deliver at Buffalo; that the charter was verbal and never reduced to writing; and that said barge Warner having, as libelant was informed, a better offer, failed to perform her charter, and by reason thereof libelant suffered damages in the sum of $680, which damages are a lien upon said barge, both by the general maritime law and the law of this state.   The answer denied that any contract or charter-party was made to transport this lumber from Alpena to Buffalo.   The fourth article alleged that Bewick made a proposition to the master of the barge which was accepted, namely, that said

barge should be placed in tow of the propeller Alpena, then about to leave for the ports of Bay City and Saginaw; that by the proposition of said Bewick the said propeller Alpena was to take said barge across Saginaw bay to Au Sable, where, if the wind should be favorable for the barge to run to Alpena, she was to go by sail, and receive and take on board a cargo of lumber and transport the same to Buffalo, and was to receive freight, according to the custom and understanding, at Bay City rates; that if the wind was not favorable for said barge to run to Alpena from Au Sable, the said propeller Alpena was to tow her there or see that she got there. It further alleged the taking of the barge in tow for Alpena in pursuance of this proposition and its acceptance; that the wind, on the arrival of the tow near the Charity islands, was to the westward and north of west; the failure of the propeller to come to or aid the barge to go to Au Sable, but she proceeded on her way to Bay City without casting off her line or making any signal or request whatever; that as the wind then was the barge was unable to reach either Au Sable or Alpena, and it was unsafe to cast off her line as the wind then was on Saginaw bay.

Respondents in their answer set up, as a further matter of defense, exceptions to the libel upon the following grounds: (1) That a joint suit against the barge and her owners cannot be maintained; (2) that no cargo having been taken on board a suit will not lie against the barge *in rem*.

*H. H. Swan*, for libelant.

*Wm. A. Moore*, for respondents.

BROWN, J. Proceeding to dispose of the preliminary questions raised upon the exceptions to the libel, I am asked to determine—

1. Whether a joint suit can be maintained against the barge *in rem* and her owners *in personam*. General admiralty rules 12 to 20, enacted in pursuance of an act of congress, and having the force of law, define with much particularity the remedies to which the injured party is entitled in the most numerous classes of cases arising in courts of admiralty, but as no mention is made in any of these rules of suits upon contracts of affreightment, I am compelled to dispose of the question as one dependent upon the practice of the admiralty courts in that particular class of cases. The rules afford us no guide in suits of this description. In determining what the proper practice ought to be, we look to ascertain what the practice has been in analogous cases in other districts. There is certainly nothing in the rules excluding the joinder of the Warner and her owners, nor do I see that there is any principle of law violated. It is an elementary rule that the master of a vessel may bind both the vessel and her owners by contracts made within the scope of his authority, and if both are bound I see no reason in principle why both may not be pursued in the same action. Precedents, however, are not wholly wanting. Thus, in the case of *Vaughan* v. *630 Casks of Sherry*, 7 Ben. 507, which was a libel against a cargo and its consignees for freight,

Judge BLATCHFORD held that, as the cause of action arose out of a contract which, if the respondents were liable upon it, also bound the property, and as the respondents claimed the property, there was no reason for not joining a cause of action against the property *in rem* with one against the respondents *in personam.* This case was affirmed upon appeal by Mr. Chief Justice WAITE in 14 Blatchf. 517. A similar ruling was made by Judge BETTS in the case of *The Zenobia,* Abb. Adm. 48, which was also a libel *in rem* against a bark and *in personam* against her master to recover damages for non-performance of a contract of affreightment. I see no reason for joining the master which would not apply with equal force to the owner. In deciding this question, Judge BETTS noticed that the rules of the supreme court did not provide for libels of this description, and neither authorized nor forbid the joinder. "The consequence is that such cases fall within the scope of rule 46, which prescribes that in all cases not provided for by the foregoing rules the district and circuit courts are to regulate the practice of those courts, respectively, in such manner as they shall deem most expedient for the administration of justice. The practice in respect to the question under consideration is therefore left to be regulated at the discretion of the courts in the various districts." In other cases in the same district the same principle has been approved. *The Aldebaran,* Olc. 130; *The Merchant,* Abb. Adm. 6; *The Monte A.* 12 FED. REP. 336; Betts, Adm. Pr. 20.

In *The Clatsop Chief,* 8 FED. REP. 164, the learned judge of the district of Oregon expressed the opinion that, in the absence of general admiralty rule 15, a suit for damages for collision might be sustained against the vessel and her owner, and approves the practice in New York. There is nothing in the case of *The Sabine,* 101 U. S. 384, which would prevent such joinder in a libel upon a contract of affreightment. This was a suit for salvage, and the supreme court held that it would not lie against the vessel and the consignees of her cargo. Indeed, the court could not have held otherwise without disregarding the nineteenth general admiralty rule. No opinion, however, was expressed in that case with reference to suits not embraced in these rules. As the practice in New York upon this subject is entirely well settled, (see Betts, Adm. Pr. 20; Ben. Adm. Pr. 526; Bump, Fed. Proc. 851,) as well as the cases above cited, and as my attention has not been called to any other cases which hold that such practice is not a proper one, except that of *The Alida,* 12 FED. REP. 343, and as it is in the interests of speedy justice, I am not disposed to sustain this exception.

2. The next objection raised by the answer is that this court has no jurisdiction either *in rem* or *in personam* of the matters set forth in the libel. That there is no lien upon this vessel by the general maritime law, follows from the opinion of this court in the case of *Scott* v. *The Ira Chaffee,* 2 FED. REP. 401, in which I had occasion to

hold that the owner of a cargo has no lien upon the vessel for the breach of a contract of affreightment until the cargo or some portion has been laden on board or delivered to the master. *The William Fletcher*, 8 Ben. 537. See, also, *The Prince Leopold*, 9 Fed. Rep. 333; *The Monte A.* 12 Fed. Rep. 336. Libelant, however, claims a lien under the laws of this state, which provide that "every water-craft of above five tons burden  *  *  *  shall be subjected to a lien  *  *  *  (4.) for all damages arising from the non-performance of any contract of affreightment, or of any contract touching the transportation of persons entered into by the master, owner, agent, or consignees of such water-craft wherein such contract *is to be* or shall have been performed, in whole or in part, within this state." There can be no doubt that a contract of affreightment is a maritime contract, although, by the maritime law, no lien arises upon the vessel until the cargo or some portion of it has been delivered on board or into the custody of the master. The character of the contract itself is fixed at the time it is entered into, and it is no less maritime in its nature at that moment than when the delivery of the cargo begins. The words "is to be" performed clearly contemplate a performance in the future. Although purely executory, the court of admiralty has jurisdiction *in personam. Maury v. Culliford*, 10 Fed. Rep. 388; *Oakes v. Richardson*, 2 Low. 173; *Rich v. Parrott*, 1 Cliff. 55; *Morewood v. Enequist*, 23 How. 493. Nor is there any doubt in my mind that if the contract be maritime, and therefore cognizable in the court of admiralty, the state legislature may annex to it a lien upon the vessel which can be enforced by this court. It is doubtless true, as said in *Edwards v. Elliott*, 21 Wall. 532, that state legislatures have no authority to create a maritime lien, nor can they confer any jurisdiction upon a state court to enforce such a lien by a suit or proceeding *in rem*, as practiced in the admiralty courts. See, also, *The Belfast*, 7 Wall. 644; *The Moses Taylor*, 4 Wall. 411; *The Hine* v. *Trevor*, Id. 555. But we are not speaking of maritime liens or of enforcing such liens in state courts. Granted that the *contract* is maritime in its nature, the power of a state to attach a lien which may be enforced here is beyond question. Thus in *Ex parte McNiel*, 13 Wall. 236, a state law conferring a lien for pilotage was enforced. So in *The Lottawanna*, 21 Wall. 580, it was held that a state law might give a lien enforcible *in rem* in the admiralty for materials and supplies furnished in the home port of the vessel, although no such lien existed by the law maritime. In *The Virginia Rulon*, 13 Blatchf. 519 a suit *in rem* was sustained for wharfage, although it was supposed at that time that no such lien existed by maritime law. So in the case of *The Garland*, 5 Fed. Rep. 927, this court sanctioned the right of an administrator to proceed *in rem* for the recovery of damages under the laws of this state for negligence causing the death of the intestate, upon the ground that the state statute gave the right of action which the court might enforce by appropriate proceedings

of its own. See, also, *Taylor* v. *The Robert Campbell*, 20 Mo. 258. The objection made by claimant, that the legislature of this state has no power to legislate with respect to contracts made in other states, is untenable. The contract in this case, though made in Buffalo, was to be performed, partly at least, within this state. While contracts are ordinarily interpreted by the laws of the state wherein they are made, there is an exception equally well recognized in cases of contracts made in one state to be performed in another. The laws of the latter state govern not only the interpretation of the contract but the remedies for its enforcement. Story, Confl. Laws, § 280. The legislature evidently did not transcend its power in attaching a lien to a contract to be performed within this state.

Coming now to the merits of the case, the principal dispute arises from the contract itself. Libelant's testimony tends to show that Bewick met the master of the barge in Buffalo, and told him that he could sell some lumber to Holmes & Co., of that place, provided the barge would carry it, and that he wished him to bring it down from that place; that if the wind was unfavorable he would tow the barge as far into Saginaw bay as he could before changing his course to Bay City, and leave her there, where she was to lie until the wind changed, and she could proceed under sail or could take a tug herself to Alpena; and that if she found no means of reaching Alpena before the Alpena left Bay City for Chicago he would again take the barge in tow and leave her at Thunder Bay. Upon the other hand, respondent's testimony tends to show that the master of the Alpena was to see that she got to Alpena in some way or other himself; in other words, that he guarantied that she should get there by libelant's exertion and not by his own. Not only is the libelant's theory of the contract sustained by the testimony of himself and of McGregor, in opposition to that of Capt. Walker alone, but it looks to me very improbable that the Alpena, which was then bound for Bay City, should assume the responsibilty of seeing the Warner safely to Alpena, which might involve the taking of his entire tow a day's journey off his direct route or sending out a tug from Bay City at a large expense. The fact was that when the tow reached Pointe Aux Barques the wind was not such as would enable the barge to proceed to Alpena under the little sail she carried, and that the Alpena towed her over beyond the Charities and within two or three miles of the west shore of Saginaw bay, where they arrived about the middle of the night; that the master of the Warner, which had been placed in the rear of the tow for the express purpose of being cast off, made no request to the barge in front of her to throw off her line, or to pass the word to the propeller to stop, but allowed herself to be towed to Bay City. That it was his duty to hail the barge in front of him to cast off his line, I have no doubt. He knew better than any one else where he wished to stop, and might at any time have given directions to be cast off. The master of the tow, on the other

hand, had the right to expect that he would do his duty in this regard, and was under no obligation to stop his tow unless he was hailed to do so. Under these circumstances it cannot be wondered at that the master of the Warner, on meeting Capt. Walker at Bay City next morning, should have remarked, "I can't tell myself what I am doing here," or that he should write libelants an apologetic letter asking them to exonerate him from the non-performance of his contract. It appears that freights in the mean time had risen, and that before the barge had been in Bay City an hour the master had chartered a cargo to Buffalo. Whether this was the inducement for his failure to perform his contract it is unnecessary to determine; but it seems to me entirely clear that there was such failure, and that libelant is entitled to recover the difference between the Bay City rates at that time, which appear to have been $1.75 a thousand, and the rates which he was obliged to pay to get this lumber to Buffalo, provided he used proper diligence in obtaining a vessel for that purpose.

Respondent being desirous of putting in testimony upon that point, I see no objection to referring the case to a commissioner to compute the damages; and it is so ordered.