OMSLAER and others *v.* PHILADELPHIA Co.

*(District Court, W. D. Pennsylvania.*   May 21, 1887.)

1. NAVIGATION—OBSTRUCTION TO—GAS MAIN.
    The defendant company, having authority under the laws of Pennsylvania to lay and maintain pipes for transportation of natural gas across the Allegheny river, laid an eight-inch main across and resting on the bed of the river, wholly exposed, so as to interfere with the free and safe passage of boats. *Held,* that the pipe should have been buried underneath the river bed, and as laid it was a wrongful obstruction to navigation.

2. SHIPS AND SHIPPING—INJURY TO VESSEL BY OBSTRUCTION IN RIVER—LIA-
    BILITY.
    A steam-boat descending the river through a ripple hard to navigate by reason of low water, crookedness of channel, etc., grounded her bow on a small hidden lump; whereupon, the engines being stopped, the cross-current swung the boat around until her bottom came in contact with and stuck fast on said

pipe. The river was falling, and, apprehending that the boat would break in two if left on the pipe, the libelants (the owner and those in charge of the boat) essayed to pull her off by warping, *i. e.*, fastening a line to shore, and attaching the other end to the boat's capstan, which was worked by steam. Under the strain the pipe parted at a flange put thereon to repair a previous break made by another boat. There was an escape of gas, which instantly filled the boat, and, igniting, caused personal injuries to libelants, and the burning of the boat. *Held,* (*a*) that the pilot was not culpable in not avoiding the lump; (*b*) that the grounding on the lump was of no moment, as the boat would have swung or could have backed off, save for her entanglement with the pipe; (*c*) that libelants were not chargeable with negligence, either because of failure to communicate with defendant before undertaking to free the boat, or on account of the method resorted to; (*d*) and that the defendant's wrongful act was the proximate cause of the disaster, and defendant was answerable for the damages sustained.

**3. SAME—CONTRIBUTORY NEGLIGENCE.**

The libelants are to be judged by the standard of common prudence and experience; and, acting in an emergency, they are not to be held responsible for a mere mistake of judgment.

**4. SAME—PROXIMATE CAUSE.**

Having wrongfully placed in the channel of the river a natural gas main, which was exposed to rupture by steam-boats running foul of it, defendant cannot be heard to say that the ill consequences experienced by libelants were such as could not have been foreseen.

In Admiralty.

*Barton & Sons,* for libelants.

*John Dalzell* and *William Scott,* for respondents.

ACHESON, D. J. On the afternoon of December 1, 1885, the steam tow-boat Iron City, having taken a raft of timber from the foot of Herr's island, up the Allegheny river, through the ripple at or near the head of the island, known as "Garrison Ripple," to its place of destination, a short distance above, at the trestle-work of the Pittsburgh & Western Railroad Company, on the north or Allegheny shore, turned out from the shore on her return trip. The boat at first proceeded up stream such short distance as in the judgment of the pilot seemed to be sufficient, and then rounded out into the river until her head was pointed down stream. When the boat had about entered Garrison Ripple channel, and while moving, as respects speed, with proper caution, her head grounded on a small lump of rock and gravel under water, which the witness Wentley (who lives in the neighborhood, and is familiar with the locality) describes as about eight or ten feet square, and standing eight or ten inches above the bed of the river. Immediately the engines were stopped, and the cross-current, striking the larboard side of the boat, swung her round, her head working as if on a pivot, and her stern turning towards the Allegheny shore, and on further around, until nearly half way round, when the bottom of the boat out towards the stern came in contact with and struck on what proved to be an iron pipe of the diameter of eight inches, belonging to the defendant company, and used by it for the transportation of natural gas.

Describing the manner in which the Iron City was caught on the pipe, Joseph Fairbaugh, the watchman on the boat, says: "She run on that lump slowly, the same as if she'd run on any other bank. The hardest

knock was when she struck on the pipe. When she struck the pipe it shook her up pretty hard. There was a sudden stop." At first the persons aboard the boat did not know what it was the stern had caught on; but it was soon discovered. John W. Tompkins testifies that he at once sounded with an oar, and found the water getting deeper and deeper as he went back towards the stern, until he struck an object which he recognized as a pipe, and that he passed the oar over the pipe, and down on the other side of it, and that he judged the water along-side the pipe measured eight or nine inches. Mr. Tompkins is an entirely disinterested witness. His testimony is highly important, as showing the situation of the gas-pipe with respect to the bed of the river before anything was done to disturb it.

Word having been sent to James Omslaer, the owner of the boat and one of the libelants, he, together with J. W. Wentley, Charles Vomos, and Smith Walker, went to the assistance of the boat. They reached her about 7:30 o'clock that evening, when a careful examination was made. Mr. Wentley testifies that he went all around the boat in a skiff, sounding with an oar. He states she was aground about 20 feet back from the bow; that from there back to the gas-pipe there was plenty of water; that she was caught on the pipe on one side about 50 feet from the stern, and on the other about 30 feet. In sounding with the oar this witness, when he came to the pipe, felt it, and then raising the oar, passed it over and down on the other side. The boat lay quartering in the river, her bow up stream, inclining towards the Pittsburgh side and her stern towards the Allegheny side. Up to this time no effort had been made to get the boat off the pipe, except that the pilot had caused a few backward and forward revolutions of the wheel to be made, but without any effect.

The Iron City was a stern-wheeler, about 120 feet long exclusive of the wheel, had a 22 feet beam, a model hull, with sharp bow, sloping and rounding off, and down a little under the water was flat-bottomed. On this occasion she was running light,—without any cargo,—and was drawing about 34 inches of water. The evidence indicates that the then depth of water in the channel at Garrison ripple was about three and a half feet only, and the river was falling. Mr. Omslaer, Mr. Wentley, and Mr. Black, the pilot of the boat, all experienced river men, testify that on a falling river there was danger that the hull of the boat, if left on the pipe, would break in two. To prevent this apprehended mischief steps were taken, as soon as possible, to get the boat afloat by "warping," the usual method practiced by river men for pulling boats off when they are fast aground. The method here adopted was this: A line was sent out to the Allegheny shore, and there made fast, and the other end was attached to the boat's capstan, which was worked by the "nigger" or auxiliary engine. The line parted twice, but on the third attempt the head of the boat came off the lump. The nigger engine was then kept at work to pull the stern of the boat off the pipe, when suddenly there was a violent escape from the pipe of natural gas, which instantly enveloped and filled the boat, and ignited from a light in the

engine-room, or the fire under the boilers, causing an explosion, result-ing in personal injuries to several of the libelants, and the destruction of the tow-boat, which immediately took fire, and burnt to the water's edge. The explosion occurred about 2:30 A. M. of December 2d.

Subsequent investigation disclosed the fact that the gas had escaped from a break at a flange which had been put on the pipe to repair a fracture which the steam-boat Park Painter had made on May 8, 1885. That fracture was repaired by a flange-union formed by two pieces of cast-iron 14 inches in diameter, and three inches thick, with a lead gasket in the center, and held together by bolts. Under the strain to which the pipe was subjected by the effort to free the Iron City, the bolts hold-ing the two parts of the flange together parted. This flange projected at least three inches beyond the exterior surface of the pipe, thus forming what Mr. Omslaer calls a "knuckle," which he thinks held the Iron City, and prevented her from sliding off the pipe. Certain it is that, when the wreck was turned upside down, there was observable, running diag-onally across the bottom of the hull, a deep score, and a hole in the line of the score, both apparently made by the same thing. The flange would account for both if the boat passed over it. But, whether or not the boat was held by the flange, without any doubt the rupture which caused the fatal mischief occurred there as above stated.

This suit was brought by James Omslaer to recover for the loss of his boat, etc. Afterwards the other libelants filed an intervening libel to re-cover damages for the personal and other injuries sustained by them respectively.

The Philadelphia Company is a corporation of the state of Pennsyl-vania, and in December, 1885, was engaged in the business of transport-ing natural gas, by means of pipes from the wells to places of consump-tion, as fuel in the city of Pittsburgh and vicinity. The company claims that, under its original charter of incorporation, (Act March 22, 1871, P. L. 1873, p. 955,) it had the implied right to lay and maintain lines of pipe across the Allegheny river; and also that it was expressly in-vested with this right by virtue of section 10 of the general act for the incorporation and regulation of natural gas companies, approved May 29, 1885, (P. L. 29.) Although it does not appear from the proofs that the defendant company has accepted the provisions of the latter act, yet, for the purposes of this case, it will be assumed that the company was clothed with the right in question, subject to liability for damages occasioned by the negligent exercise thereof.

The libelants contend that the damages sustained by them respectively were occasioned by reason of the negligence of the defendant company in the manner of laying and maintaining its said gas-pipe across the Allegheny river; that it was incumbent on the company to bury its pipe beneath the river bed, but that this was not done; and hence that it was a dangerous and unlawful obstruction to the free navigation of the river, causing the disaster to the Iron City. That it was the duty of the de-fendant company to lay its pipe under the bed of the river, so as not to interfere with the safe passage of boats, I do not understand to be de-

nied. The answer impliedly concedes both the feasibility and necessity of so doing, for it alleges that all the defendants' pipes crossing the Allegheny river, including the particular one here in question, were so laid. What, then, was the fact with respect to the pipe crossing at Garrison ripple? This pipe was laid in the month of April, 1885, when the water was at a high stage. It is not alleged that it was then buried. At first it was held in place against the current by iron pickets or spikes, with hooks on top to fit the pipe, the spikes being placed on the lower side of the pipe, and driven down into the bed of the river. But in the summer of 1885 a force of hands was employed by the defendant company to lower and bury the pipe. Albert Hyland, the defendants' superintendent, testifies that on what is called the "Dry Bar," which is towards the Pittsburgh side, the pipe was buried four or five feet deep; that on the "Island Bar," which is towards the Allegheny side, the ditch averaged 28 inches in depth; and that between these bars the whole line was buried under the bed of the river, with the exception of probably 50 feet in the center of the channel,—the main channel. But Gordon Hulings, the defendants' foreman, who followed the men engaged in lowering the pipe, and drew the pickets, testifies thus: "The pipe not buried there in the channel was not more than *one hundred and fifty feet.*" It is quite certain, from the defendants' own evidence, that at no time was the entire line buried. How was it with that portion of the line at the place where the catastrophe to the Iron City occurred? Mr. Hyland, and several of the defendants' other witnesses, say that it was buried underneath the bed of the river, and was kept so. Doubtless these witnesses honestly think such was the case. But the evidence leads me to the opposite conclusion. Endeavoring to explain the cause of the accident, Mr. Hyland, in the course of his cross-examination, confidently declares that the Iron City "tore our pipe from its bed from the motion of her wheel." But this theory is not supported by any evidence. Indeed, it is conclusively proved that the boat, while swinging around with a motionless wheel, forcibly struck and became fastened on the defendants' pipe. Investigation by sounding, which immediately followed, demonstrated that the pipe was not buried, but lay upon the bed of the river altogether exposed.

I cannot doubt that the defendant company was chargeable with negligence in thus leaving its pipe unburied at the place of this disaster. If, under all circumstances, the company was not bound to exercise its franchises in subordination to the right of vessels to the free navigation of the river, it certainly could not unnecessarily interfere with that right. But this pipe was an unnecessary obstruction in the way of boats. Moreover, the navigation of Garrison ripple, as will presently appear, is beset with great natural difficulties, and to add to them an artificial obstacle was particularly reprehensible. And, furthermore, the fact that the steam-boat Park Painter had broken the line of pipe at this point was a warning to which the defendant should have given heed.

But the defendant contends that the Iron City was badly navigated, and that the calamity which befell her and the libelants was occasioned

by the unskillfulness and lack of due care on the part of those in charge of and managing the boat. It is claimed, in the first place, that, by reason of the ignorance of the pilot or his want of skill, the boat was out of the proper channel when she ran aground, and that thus the misfortune which ensued was brought upon her; and, in the second place, that the libelants were negligent and rash in their efforts to pull the boat off the gas-pipe, and in the method they pursued. Let us see whether these allegations are well founded.

Elsie P. Black, the pilot of the Iron City, was an experienced river man, and a licensed pilot for many years. He had frequently piloted steam-boats through Garrison ripple, on up-trips and down-trips, at different stages of water, and had done so several times not long before this disaster. Only three days before he had piloted the Iron City with a raft in tow up through the ripple to the same destination, and then down stream again, after her tow had been left at the trestle-work. He states that on the afternoon of December 1st he pursued the same course as on previous occasions as nearly as he could.

The uncontradicted evidence shows that Garrison ripple, at the low stage of water which existed on December 1, 1885, is a very difficult place to run,—one of the most difficult in the river. The current is swift, and the channel shallow and very crooked. Moreover, descending boats encounter a strong cross-current, setting towards the head of Herr's island. H. B. Hulings, an Allegheny river pilot, and a witness for the defendant, being asked by the defendant's counsel if a boat, in the circumstances of the Iron City, could not have returned down the channel of the river without coming near the place where she got aground, answered: "That would be according to circumstances. Sometimes a man will go into a place with a steam-boat with a calculation of coming out the same place again, and get considerably out of the channel. I have gone in there myself, and calculated I would come out where I went in, but drifted considerably, the boat going over the shallow water, —going sideways." Then, in the further course of his examination in chief, we read as follows:

"*Question.* What, then, is there to prevent a steam-boat, without tow or cargo, starting at the point marked [on map] 'Raft Tied,' from going up, rounding to, and going down what you have described as the low-water channel? *Answer.* As I said before, it is according to circumstances. They may drift over. *Q.* Why should they drift? *A.* Well, driving them on shoal water,—they squat." And on cross-examination this witness states: "This is about as bad a channel to run as you generally find."

Doubtless, the best water is close into the "Dry Bar," but, while recognizing this, Edward J. Hulings, a river captain and pilot, adds: "Sometimes you can get in close, and sometimes not; it is according to the wind," etc. Thomas Cavett, a pilot on the Allegheny river, (a witness for the libelants,) speaking of the place where the defendants' pipe crossed the river, says: "But in coming down we can't cross over where it is deep; can't steer a boat in there; have to flank as the current sets in towards the island, and we have to go down where it is shoal."

There is other testimony to the same general effect as that above quoted, and none to overcome it. In view, then, of the great difficulty in running down through the head of Garrison ripple at the then stage of water, and giving proper consideration to the evidence of the expert witnesses, I do not think that any unskillfulness or carelessness can justly be imputed to the pilot of the Iron City because he did not avoid the small concealed lump upon which the boat grounded, or failed to keep to the Pittsburgh or "Dry Bar" side of the same. Moreover, in the judgment of experienced witnesses, the grounding of the Iron City at the bow was not a matter of any moment. They state that she could have backed off readily from the lump if her stern had been free. Indeed, some of them say that, without using her wheel, she would have swung off if her course had not been arrested by the pipe. I am satisfied that the serious trouble arose from her having caught on the defendants' pipe. Save for this entanglement, a resort to "warping" would not have been necessary. Mr. Black, the pilot, testifies: "If I had been 20 feet either way, [i. e., on either side of where the bow grounded,] I'd have gone through; and if her stern hadn't caught on the pipe I would have gone through anyway, as there was plenty of water for her." There is much evidence corroborative of this statement.

That there was sufficient water on the Allegheny side of the lump to float the boat is indisputably established by the fact of her swinging around until she struck the pipe. Then the measurements made that evening, as testified to by several witnesses, showed that there was no lack of water. This is further confirmed by measurements made the next morning by Edward J. Hulings, a disinterested person. This witness is a steam-boat captain and pilot, familiar with Garrison ripple, who assisted in laying the defendants' pipe originally, and helped "to fish the pipe out" after it had been broken by the Park Painter, and when it was repaired by the flange union. His testimony, therefore, is entitled to great weight. He visited the wreck of the Iron City on the morning of December 2, 1885, and made an examination while it still lay on the defendants' pipe. He says: "I measured the water on the pipe that morning. It measured 31 inches. I made an examination at the side of the pipe, and it measured from 40 to 41 inches. I saw the pipe lying in the bottom of the river that morning. It looked to me as if it was lying in the bottom of the river there in the channel." The hull was 22 feet wide, and covered that much of the pipe. Mr. Huling's measurements were towards the north or Allegheny shore, and extended out from the wreck 10 or 12 feet. He states that he did not measure on the other or Pittsburgh side of the wreck, because the current was too swift there for him to manage his skiff. For that reason he could not find the flange union, but he knew it was near the wreck. It was located by Harry M. Jones, a diver, who on the afternoon of December 2d went down into the river, and ascertained that the break was at the flange union. Mr. Jones states it was on the Pittsburgh side of the wreck, and about 10 feet from it. Mr. Hylands states that, in endeavoring to get off the pipe, the Iron City pulled it up stream about 10 feet.

This may be so, but the fact does not weaken the effect of the evidence as to the depth of water derived from Mr. Huling's measurements.

Upon this branch of the case, then, my conclusion from the proofs is that while the Iron City, at the time the disaster overtook her, may not have been in the very deepest part of the channel, she yet was in navigable water, and where she had a perfect right to be. From no portion of the river then navigable by the boat could the defendant company lawfully exclude her.

We now come to the consideration of the question whether the libelants were in fault in attempting to pull the Iron City off the defendants' natural gas-pipe, or in the manner in which they proceeded to do so. Was it their duty first to communicate with the defendant company to the end that the gas might have been shut off from the pipe? Were they culpable in the method to which they resorted to free the boat? If they were in fault at all, it must have been in these particulars, or one of them. Mr. Omslaer testifies: "When I found the boat on the pipe, I used my best judgment to get her off." In passing on his conduct, we must regard the then existing circumstances. It is safe to affirm that only a man of extraordinary caution would have thought of notifying the defendant company before resorting to measures to extricate the boat. An emergency was upon the libelants calling for swift action. The steam-boat, as they believed, was in a position of peril by reason of a falling river. It was, then, their duty to take prompt steps for her deliverance. Now, while the pipe was not buried, it yet rested upon the bed of the river. The Iron City was flat-bottomed, and she was light, having neither tow nor cargo. Was it not a reasonable supposition that the boat would slide off the pipe if sufficient force were applied? The libelants were unconscious of their proximity to the flange union, and, indeed, knew not of its existence. "Warping," as we have seen, is the usual method of freeing a boat when hard aground. What more natural than a recourse to that expedient? Mr. Omslaer says he did not "dream" of danger; that the parting of the pipe never occurred to him. We can well believe him. None of the officers or crew of the boat, or those employed to assist them, (in all eight persons,) had the slightest apprehension. Several of them were old river men, of large experience. The exercise of ordinary and reasonable caution and care was all that was incumbent on them. The libelants are to be judged by the standard of common prudence and experience. For a mere mistake of judgment they are not to be held responsible. *Pennsylvania R. Co.* v. *Werner*, 89 Pa. St. 59. Upon the whole, it seems to me that the libelants acted as other men of ordinary judgment would have done under similar circumstances. I do not see wherein they are blamable.

The libelants, then, being free from any fault, it is no answer to their demands for damages to say that they themselves contributed to the disaster by pulling the pipe apart. Shear. & R. Neg. § 28; *Pittsburgh City* v. *Grier*, 22 Pa. St. 54. Nor is the proposition that the defendant's negligence was not sufficiently proximate to sustain this suit tenable. Id.; *Milwaukee, etc., R. Co.* v. *Kellogg*, 94 U. S. 469, 474. Having

wrongfully placed in the channel of the river a natural gas main, which was exposed to rupture by steam-boats running foul of it, the defendant company cannot be heard to say that the ill consequences experienced by the Iron City were such as could not have been foreseen. The destruction of a steam-boat in the predicament of the Iron City, and the injury of those aboard of her, would be the natural and probable result of the escape from the broken pipe of a fluid so volatile and inflammable as natural gas.

To the suggestion that some of the libelants were mere volunteers or spectators at the place of danger, it need only be replied that the persons referred to were present lending assistance to the Iron City in her distress, at the request, express or implied, of Mr. Omslaer, and are to be regarded as having been in the boat's service on this occasion.

The only remaining matter is to determine the damages of the libelants, respectively. And here I must content myself with merely announcing results. In respect to the personal injuries, it would have been more satisfactory to me had the proofs been somewhat fuller. It is always a matter of difficulty to fix a just compensation for such injuries. Here I have exercised my best judgment upon the evidence before me. I may add that, according to the testimony of the surgeons, the injuries sustained by Charles Vomos and Smith Walker were very serious, and probably will leave evil effects of a permanent nature.

The court finds the damages of the libelants, respectively, to be as follows, viz.: Of James Omslaer, $6,600, with interest from December 2, 1885; of Charles Vomos, $4,500; of William Galbraith, $1,000; Smith Walker, $4,500; W. J. Wentley, $400; Elsie P. Black, $125; of Joseph Fairbaugh, $70; and Frank Ubrey, $17.

Let a decree be entered against the Philadelphia Company in accordance with the foregoing opinion and findings of the court, with costs of suit.