## THE RAITHMOOR.

(District Court, E. D. Pennsylvania. February 24, 1911.)

### No. 37

**1. ADMIRALTY (§ 6\*)—SUBJECTS OF JURISDICTION—"VESSEL."**

A navigable structure intended for the transportation of a permanent cargo, as a scow carrying a pile driver and engine, which has to be towed in order to navigate, is a "vessel," and within the admiralty jurisdiction.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 86–98; Dec. Dig. § 6.\*

For other definitions, see Words and Phrases, vol. 8, pp. 7297–7301.]

**2. ADMIRALTY (§ 6\*)—SUBJECTS OF JURISDICTION—UNCOMPLETED BEACON.**

Concrete piles built in a navigable stream by a contractor for the government—intended to support a beacon, but which structure had not been completed—had not yet reached the stage when they were devoted to maritime purposes, and a court of admiralty is without jurisdiction of a suit to recover for their injury by a moving vessel.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 86–98; Dec. Dig. § 6.\*]

**3. COLLISION (§ 71\*)—MOVING AND ANCHORED VESSELS—VESSEL OUT OF CHANNEL.**

The steamship Raithmoor passing up the Delaware river at night in charge of a pilot came into collision with an anchored scow and pile driver which were being used in the construction of a government beacon. The structure and vessels were 300 feet to the eastward of the regular used channel, and were lighted, but the pilot testified that he did not see the lights until immediately before collision. *Held*, that the steamship was in fault for being out of her course, and, in the absence of clear proof that the lights on the scows were improperly placed and misled her, she was solely liable for their injury.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 101; Dec. Dig. § 71.\*]

In Admiralty. Suit by the Latta & Terry Construction Company against the steamship Raithmoor. Decree for libelant.

H. Alan Dawson, for libelant.
Henry R. Edmunds, for respondent.

J. B. McPHERSON, District Judge. On the evening of Sunday, July 18, 1909, the Raithmoor—a British steamship, 323 feet long, 47 feet beam, loaded with iron ore, and drawing 22½ feet—was coming up the Delaware in charge of a pilot. About 8:30 or 9 o'clock she

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

collided with a scow and some other property belonging to the libelant, the Latta & Terry Construction Company, doing a good deal of damage. The night was dark and overcast, but lights could be easily seen over the usual distance. The tide was in the first hour of flood. Of the injury to the scow it is conceded that the admiralty has jurisdiction; but the right of the District Court to entertain the suit for injury to the other property is denied. It is therefore necessary to consider this question in limine. The facts are these:

The company was executing an independent contract with the United States, which bound them to furnish the necessary materials, labor, plant, etc., and to erect in place a foundation pier to receive a gas beacon. The work was under the continual supervision of a government official, but had neither been finished nor accepted. The structure was to consist of three cylindrical piles of reinforced concrete to be sunk about 19½ feet into the bottom of the river, and to project 12 feet above mean high water, these to be covered with a sheet steel cap. The piles were to be encased in steel and to be protected also by depositing rip-rap around them to a specified height. When completed, the pier was to be used solely as a beacon on the edge of a navigable channel that has not yet been made ready, and the government was to install upon the cap a lamp and other appliances. The site is three-fourths of a mile from the eastern or New Jersey shore, and about two miles from the western or Delaware shore, of the river, and is surrounded by navigable water, about twenty-seven feet deep at low tide. The work was begun in June, and at the time of the collision was approaching completion. The piles were in place, and not much remained to be done except to put the metal cap into place and deposit the rip-rap. The necessities of the work required a temporary platform to be built close to the concrete piles. This was of wood, about 15 feet square, and rested upon wooden piling driven into the bottom of the river. A pile driver was also necessary, and this, with a scow to hold materials, tools, etc., was anchored a few feet to the south. The pile driver is a wooden floating scow having the usual apparatus built on the forward end, and an engine installed on the after end in a shed or house. Neither the pile driver nor the scow has any motive power, but both are intended and adapted for use upon the water. The collision injured the scow and the pile driver, and practically demolished the concrete piles and the temporary platform.

[1] Has the admiralty jurisdiction to redress the injury to the pile driver, the concrete piles, and the temporary platform? The decisions leave the question in some doubt as to the pile driver, but I incline to resolve the doubt in favor of the jurisdiction. I shall not take the superfluous trouble of doing again what Judge Cochran has already done so well in Barnes v. One Dredge Boat (D. C.) 169 Fed. 895, 900. He has there collected the cases on this much litigated subject, and has discussed them with care and discrimination, and I agree with his conclusion that "a navigable structure intended for the transportation of a permanent cargo, which has to be towed in order to navigate, is a 'vessel.'" If this is correct, the pile driver is a vessel, and is subject to the admiralty jurisdiction.

[2] The more difficult question concerns the unfinished beacon and the temporary platform. As it seems to me, they stand or fall together, and need not be treated separately. If the beacon had been finished, the platform would have been removed—or have ceased to be used—but it was an appliance necessary for the unfinished structure, and I think may properly be considered as a part of it. Is an unfinished beacon, situated as this structure was, a subject of admiralty jurisdiction? If it had been finished and in use, The Blackheath, 195 U. S. 361, 25 Sup. Ct. 46, 49 L. Ed. 236, would undoubtedly support the action. The injury then would have been to "a government aid to navigation from ancient times subject to the admiralty; a beacon emerging from the water, injured by the motion of the vessel, by a continuous act beginning and consummated upon navigable water, and giving character to the effects upon a point which is only technically land, through a connection at the bottom of the sea." It may be added that the court explained in Cleveland Terminal Co. v. Steamship Co., 208 U. S. 316, 28 Sup. Ct. 414, 52 L. Ed. 508, that The Blackheath did not disturb the rule announced in The Plymouth, 3 Wall. 20, 18 L. Ed. 125, namely, that:

"The true meaning of the rule of locality in cases of maritime torts was that the wrong must have been committed wholly on navigable waters, or at least the substance and consummation of the same must have taken place upon those waters to be within the admiralty jurisdiction. A substantial cause of action arising out of the wrong must be complete within the locality on which the jurisdiction depended."

And it was therefore held—as also in The Troy, 208 U. S. 321, 28 Sup. Ct. 416, 52 L. Ed. 512—that:

"The admiralty does not have jurisdiction of a claim for damages caused by a vessel to a bridge or dock which, although in navigable waters, is so connected with the shore that it immediately concerns commerce upon land."

And I may refer, also, to Bowers Co. v. Federal Co. (D. C.) 148 Fed. 290; The Poughkeepsie (D. C.) 162 Fed. 495 (affirmed in 212 U. S. 558, 29 Sup. Ct. 687, 53 L. Ed. 651) and The Curtin (D. C.) 152 Fed. 588, in which The Blackheath has been applied. But it is evident, I think, that the Supreme Court has not yet decided the pending question, which may be stated more narrowly in these words: Had this structure reached the point where it must be described as "a government aid to navigation," or was it still so incomplete that the maritime character of a beacon had not yet attached? I am aware that it may seem artificial to decide that the admiralty cannot redress this wrong, although it is clear that, if the beacon had been completed, an injury to the concrete piles could be redressed as fully as an injury to the lamp. But the line of demarcation must be drawn somewhere. The materials intended to compose these piles would not be protected by the admiralty as long as they remained on shore, or on a projecting pier, or on any other structure affixed to the land or immediately serving commerce on land. They could only gain such protection by becoming devoted to maritime purposes, and there must necessarily be some point of time when the maritime character is taken on. Before that point is reached, all that can be said, as it seems to me, is that

the work of transferring them from one jurisdiction to another is still in progress, but has not yet been finished. The analogy of a ship seems to be instructive. Indeed, if it is applicable at all, it is controlling. There can be no doubt for what purpose a ship is intended, but while it is being built, even although it may be afloat, admiralty declines to take jurisdiction. After it has been finished and begins to carry on a maritime business, the jurisdiction attaches without delay. This point has been often decided. Ferry Co. v. Beers, 20 How. 393, 15 L. Ed. 961; Edwards v. Elliott, 21 Wall. 553, 22 L. Ed. 487, and many cases cited in note 37 upon page 828 of 1 Cyc. I do not see, therefore, upon what sufficient ground it can be held that the incomplete structure had already become a beacon of which the admiralty had acquired jurisdiction. It was still a mere collection or compound of materials partly put into place, but not yet devoted to the maritime purpose for which it was ultimately intended. Indeed, it might never be finished. The channel might never be widened. The government might change its mind before the work was done and might abandon the enterprise; and certainly neither the frame of a ship rotting on the ways nor the skeleton of a beacon disintegrating under the action of the elements offers the criteria needed to satisfy the tests of admiralty jurisdiction. The case under consideration is new, and presents some hardship, but I cannot convince my mind that the jurisdiction exists. I must hold, therefore, that the libelant cannot recover in this court for the damage to the concrete piles and the temporary platform; but, as the suit is well brought for the injury to the scow and the pile driver, it is necessary to determine whether the steamship was at fault.

[3] Upon this question I entertain no doubt. It is only necessary to point out that the place of collision was 300 feet to the eastward of the extreme edge of the present navigable channel, in order to establish that the Raithmoor was where she had no business to be. It is abundantly clear from his own testimony that the pilot had got out of the channel, and did not know accurately where he was. The site of the work was east of the point where the New Castle range intersects the Deep Water Point range. Not far below an east and west line that would connect this point of intersection with the site, a flashlight gas buoy, No. 26 or Goose Bar buoy, is situated. This is upon the extreme eastern edge of the channel as it now exists, and was burning on the night in question. (As already stated, the new beacon was to stand on the extreme eastern edge of the widened channel as it is intended to be.) Vessels coming up the river should leave No. 26 on the starboard hand, and, while the turn to starboard (or north-east) from one range to the other should be begun a few hundred feet below the buoy, the probable explanation of the pilot's mistake is that he began to turn too soon and failed to see the buoy. He swears that he did not see it until after the collision, and undoubtedly he left it to port instead of to starboard, and, as I have already said, had managed to get 300 feet and more out of his proper course. Neither did he see the lights upon the work until the master called his attention to them, and he was then so near that the disaster could not possibly

be avoided. The lights had been seen by the lookout more than a mile away, and were promptly reported to the bridge, but it is probably true that the pilot did not hear the report—the night seems to have been more or less windy—and, at all events, such is his testimony, and this circumstance may help to account for his blunder. It seems useless to speculate about what he ought to have done, or might have done, if he had heard the report or had seen the lights himself. I assume the fact to be, as he has distinctly and repeatedly testified, that he did not see them, and in that event it is perfectly clear that they could not have misled him. Much of the testimony is concerned with the lights—where they were placed, how many of them would be visible to a vessel approaching from the south, etc.—and there has been much argument concerning what is said to have been their misleading character, but for the reason just given I do not think it either necessary or advisable to go into that subject. It would only be confusing, for it cannot be important, if the pilot is telling the truth; and, moreover, it is certainly clear that, even if he had seen or heard of the lights and had supposed them to be upon a moving vessel, he was at fault for taking no bearings if he were in doubt whether the lights were in motion, for giving no signal, for proceeding at full speed, and for not slowing or stopping in time to avoid what (upon the supposition of misleading lights) he must have believed to be a present danger.

But the theory of misleading lights is in conflict with his unequivocal testimony. He could not have supposed the lights to be on a moving vessel if he did not see them at all; and the other circumstances —the absence of signals, the maintenance of speed, etc.—confirm his assertion that he never saw the lights until he was practically on top of the obstruction, and was then more than 300 feet out of his proper course. It is therefore apparent that he could not have been misled by the lights even if they had been improperly disposed, and, as this is the only fault charged against the libelant, it follows that the whole responsibility must rest with the steamship. In a word, the pilot either got out of the course mistakenly (which I believe to be the true explanation) or was trying to save time by cutting the angle of the ranges instead of keeping in the channel. In either event, he was where he had no business to be, and the ship must take the consequences. The moving vessel is presumed to be at fault (The Oregon, 158 U. S. 192, 15 Sup. Ct. 804, 39 L. Ed. 943), and, where the fault is obvious and inexcusable, as it was here, the evidence must be clear and convincing to make a case for apportionment (The Victory, 168 U. S. 410, 18 Sup. Ct. 149, 42 L. Ed. 519). This is the best the Raithmoor could hope for, but on her own showing the navigation was solely in charge of a man who could not have been misled by what he admits he did not see.

I regret that this whole controversy cannot be settled in one proceeding, but as the admiralty jurisdiction now stands I see no escape from the foregoing conclusion.

A decree may be entered in favor of the libelant, with costs. In default of agreement upon the damages a commissioner will be appointed.