JOHN W. WATSON, Appellant, v. MISSISSIPPI RIVER POWER COMPANY, Appellee.

**NAVIGABLE WATERS:**  Navigation Under Unsafe Conditions— Negligence.  The owner of a boat on navigable waters who, on encountering such darkness as renders navigation unsafe, fails to anchor, as required by Federal statutes, is guilty of negligence *per se.*

*Appeal from Lee District Court.*—W. S. HAMILTON, Judge.

MARCH 12, 1920.

REHEARING DENIED JULY 6, 1920.

ACTION at law to recover damages alleged to have been

occasioned by negligence of the defendant to a boat owned by the Steiner Amusement Company, which has assigned to the plaintiff its claim for compensation. There was a directed verdict and judgment for the defendant, and plaintiff appeals.—*Affirmed.*

*Hughes, Rankin & Doland,* for appellant.

*A. W. O'Hara, George B. Stewart, J. O. Boyd,* and *Hazen I. Sawyer,* for appellee.

WEAVER, C. J.—The Amusement Company was an organization engaged in giving theatrical exhibitions at cities and towns along the course of the Mississippi River. It owned and operated a steamboat, "Dixie," 110 feet in length, and an amusement or show boat, about 150 feet in length. The latter craft was in barge form, having no motive power of its own, and was moved from place to place by being placed in front of the steamboat and pushed by its power. H. E. Steiner, president and manager of the company, was also the captain of the boat, and John H. Brown was mate, and one Dietz its only licensed pilot. The theatrical company, some 30 or 40 people in all, was transported on the steamer and barge, as was also its outfit of accessories.

The company, with its boats, was at the city of Montrose, Iowa, on the night of May 10, 1915, intending, on the following morning, to go therefrom to the city of Nauvoo, Illinois, on the opposite side of the river. This part of the river is above the defendant's great power dam, and the general level of the water at this point has been raised some 12 to 15 feet above its natural flow at ordinary stages. Between Montrose on the west and Nauvoo on the east, there intervene two islands, known as Kimball and Dundy. Kimball Island lies to the north, and is separated from Dundy Island on the south by what is called the ferry channel, about 100 yards in width. For navigation between Montrose and Nauvoo, there seem, at this time, to have been

three recognized routes or channels. The only one which was marked by buoys passed from Montrose around the south end of Dundy Island. Another, unmarked, kept to the north from Montrose, and thence around the north end of Kimball Island. The third, also unmarked, we have already mentioned as passing between the two islands. This latter route was the one usually taken by the ferry boat plying between the two cities, and occasionally by other boats.

On the morning in question, the boat and barge of the Amusement Company undertook to make the passage between the islands, and, in so doing, the steamer struck an obstruction, alleged to have been a submerged stump, with the result that she sank in 12 feet of water. The steamer was subsequently raised and repaired at very considerable expense. It is for the damage so done to the boat and to the property thereon and for other consequential injuries that this action is brought.

The defendant is charged with liability for the losses so suffered by reason of its alleged negligence in removing the timber from the submerged parts of these islands, and leaving the stumps of trees standing at such heights as to obstruct the navigation and render it dangerous.

The charge of negligence is denied by the defendant, which also claims that the accident to the boat was occasioned by the negligence of its owner and its servants and pilot having the boat in charge.

At the close of all the evidence, the trial court sustained the defendant's motion for a directed verdict, on the ground that the contributory negligence of the Amusement Company was conclusively established. In so ruling, the court stated to the jury the reasons for its ruling. From that statement, we quote as follows:

"The defendant, the Mississippi River Power Company, had authority from the government of the United States to build this dam. That building of the dam would necessarily raise the water of the river above the dam. Before this water was raised, the Mississippi River Power Company cleared off the timber from certain islands. The raising of

the water would necessarily change what may be called the topography of the river. Before the raising of the water, these islands were cleared of timber,—if not wholly, to a large extent. Among the islands cleared off in whole, I think, were the islands known as Kimball's Island and Dundy's Island, both lying between the town of Montrose, Iowa, and Nauvoo, Illinois. In clearing the island of Dundy, it seems to be established by the evidence that at least one, if not more, stumps of trees were left standing, at a height of at least five feet. This clearing was done early in 1913, and the water was raised in the same year, flooding these islands. Before the change in the level of the water, there had existed three channels; and, in speaking of the river now, I will refer to up the river as being north. There was one channel used from Montrose on the west bank which went north and around Kimball Island, Kimball Island being the island lying north of Dundy Island, and another channel, marked by buoys, which went south and around the lower end of Dundy Island, and the third channel, which was used by the ferry boat, and perhaps to some extent by the larger boats, which was known as the ferry channel, and which has been described as being 100 yards wide between the lower or southern point of Kimball Island and the upper or northern point of Dundy Island.

"Now, the Steiner Amusement Company, on the Sunday before this accident, had shown at the town of Nauvoo, the pilot of the boat being one Edward Dietz, who had piloted the boat from the town of Nauvoo over to the town of Montrose, where they had shown the evening before, May 11, 1915. Now, at this time, there was but one of these channels marked by buoys, and that was the one running south from Montrose, around the southern point of Dundy Island, and out into the river or lake. The ferry channel was not marked by any buoys. On the morning of May 11, 1915, about the hour of 4 o'clock in the morning, the boat Dixie was taken from the landing at Montrose, being backed out by the pilot, Edward Dietz. The boat had in front of it an amusement barge, called America. Upon that barge was

located a pilot house, and from that pilot house, the pilot apparently steered. The evidence is undisputed that navigating such a steamer as the Dixie, with a barge of that character in front of it, was a different proposition from the operation of the steamer Dixie by itself. Now, a craft, in navigating the Mississippi River, navigates it under well-defined rules and regulations. Many of these regulations are by virtue of the statutes of the United States. A craft such as the Dixie could not be operated, in the exercise of due care, except by one who knew the river; and the government recognizes that fact, because the government provides for the licensing as pilots men who know the river. They must be men who are familiar with the river, with its channel, with its sand bars, with its snags, with its rocks, with its sinuosities; they must be experienced men; and, for that reason, they are examined by the United States government as to their familiarity with the portion of the river over which they expect to pilot vessels; and persons who pass this examination are what are known as licensed pilots. Edward Dietz was such a licensed pilot. He held a license from the government as a pilot from Dubuque, Iowa, down the river,—at any rate the territory in question was embraced in the territory covered by his license; and, in addition to that, he had navigated this same steamer Dixie the summer previous to the accident. He started from the harbor of Montrose on the morning of May 11th, at four o'clock. The evidence shows that this was a hazy morning,—not a clear morning, by any means. He tells in his own testimony just what took place. He says: 'When we were at Montrose, the morning of the accident, Brown and I had a talk about taking the boat and barge out, and about which channel I should take. I told him we had better go down around the foot of the island, because we could not see the marks through the slough; and he said he could see them plain.' Then he was asked, 'After this talk, did you take the boat out yourself, or did Brown take the wheel?' to which he replied: 'I backed the boat out from the land myself, and was going down through the slough, through the main chan-

nel; and he said for us to hurry out as fast as we could, to get out of the lake before the wind raised; he said he could see the hole between the two islands where the slough was, and, if I let him have the wheel, he could take the boat through. I let him have the wheel, and stood right behind him. At the time, I could not see but one end of the hole through between the islands.' I need not read much more of this testimony, except the question, 'What, if anything, prevented you from seeing the hole between the islands?' to which he answered, 'It was hazy,—kind of a smoke, rather. You could not see both ends, and you couldn't see clear through. That was the reason I would not take the boat through myself.' Brown was the mate, who took the wheel, and undertook to go through this ferry channel; and I may say that it has been established by the evidence that he went out of the channel 150 feet, and struck a snag, or one of these stumps left by the Power Company on the upper end of Dundy Island, within a short distance of where the Dixie sunk. A pilot has peculiar responsibilities; so has a captain. The captain is the man who has control of the boat; the mate is the man who acts in place of captain when the captain is off watch. He has charge of the boat when the captain is off watch. He has charge of the men and of the boat, but that authority ceases, the moment the pilot takes the wheel and the boat starts on its trip on the water. The pilot then becomes the supreme dictator, and certain well-defined duties devolve upon him. One of these duties is that provided by the Revised Statutes of the United States, Section 4487, as follows: 'On any steamer navigating rivers only, when, from darkness, fog, or other cause, the pilot on watch shall be of opinion that the navigation is unsafe, * * * the vessel shall be brought to anchor, or moored as soon as it can be prudently done.' It is also provided that, if he does go on, it is at his own risk; and, in such case, both he and the owners of such steamer shall be held responsible for all damages which may arise.

"In order to recover, in a case like this, the plaintiff must establish, not only that the defendant was negligent,

but that the injury which he sustained came about without any negligence on his part, contributing thereto in any degree; and, unless these two facts are established, he cannot recover. If either of these facts is not established by the evidence, if he fails to establish both of these facts, it is the duty of the court to direct a verdict. No contributory negligence can be blamed on the defendant. But the plaintiff avers that a person has a right to navigate this whole river. There is no question about that; but, in the navigation of the river, he must exercise due care on his part, and he must follow the regular channel; and I think the law of the United States is that, if he goes out of this channel, he does so at his own risk; but, if he goes out of this channel without any fault on his part, the case is different, and in such case, gentlemen, I would not direct a verdict, but, on the question of negligence, I would leave it to you gentlemen to say whether or not, under all the facts and circumstances of going out of the channel, it imputed contributory negligence on the part of the plaintiff."

This statement of the facts, which we approve, renders it unnecessary for us to discuss the legal propositions urged by counsel upon the question of defendant's negligence. We may concede, for the purposes of the case, the soundness of the plaintiff's contention in this respect, but the concession avails nothing, in face of the clear and decisive proof of the negligence of plaintiff's assignor.

The judgment of the district court is—*Affirmed.*

EVANS, PRESTON, and SALINGER, JJ., concur.