H. E. STEINER et al., Appellants, v. MISSISSIPPI RIVER POWER COMPANY, Appellee.

NAVIGABLE WATERS:     Rights of Public—Navigation in Noncustomary Channel. The owner of a steamboat on inland navigable waters who, in the operation of his boat, departs from the customary channels of navigation, without any excusing reasons for so doing, is guilty of contributory negligence *per se*, in case the boat is injured while out of such channels.

*Appeal from Lee District Court.*—C. W. VERMILION, Judge.

OCTOBER 17, 1922.

ACTION at law, to recover damages alleged to have been occasioned by the negligence of the defendant to a steamboat, "Dixie," owned by plaintiffs. There was a directed verdict and judgment for defendant, and plaintiffs appeal.—*Affirmed.*

*Hughes & Dolan,* for appellants.

*A. W. O'Harra, Hazen I. Sawyer,* and *J. O. Boyd,* for appellee.

ARTHUR, J.—I.   This action is the second suit growing out of the sinking of the steamer "Dixie" in the Mississippi River, near Montrose, Iowa, on the 11th day of May, 1915. The former action is *Watson v. Mississippi River Power Co.*, 189 Iowa 529, an action brought by Watson, as assignee, for damages to the show boat which was being towed by the steamboat "Dixie." The instant action is for damages to the steamboat "Dixie." In the opinion in the *Watson* case appears a statement of the salient facts of the attempted voyage of the Dixie, towing the show boat, across the Mississippi River from Montrose on the Iowa side to Dallas City, about 25 miles up the river on the Illinois side, and the sinking of the "Dixie" by running upon a submerged stump.   The facts describing the general situation are narrated in the *Watson* case, and need not be restated here. However, some of the facts are entirely different.   Not the same witnesses testified.   In the *Watson* case, there was the testimony of the pilot and the mate, whose testimony we do not have in the case before us.   Also, in the *Watson* case the testimony showed, as stated in the opinion, that the morning of the accident was a "hazy morning;" while in the instant case, the testimony is that "there was no darkness,—it was a beautiful morning, and beautiful all day."

Plaintiffs charge the defendant with liability for loss suffered, by reason of defendant's negligence in removing the timber from the submerged islands and, in so doing, leaving stumps of trees standing along the western side and across the northern part of Dundy Island, at such heights as to obstruct navigation and render it dangerous.   The charge of negligence was denied by the defendant, and it alleged that the loss and damage were due entirely to the negligence of those in charge of the navigation of said steamboat, "Dixie."   At the close of plaintiffs' evidence, the trial court sustained a motion by defendant for a directed verdict, on the ground that plaintiffs had failed to establish freedom from contributory negligence; and afterwards denied a motion for a new trial on the same ground, and entered judgment on the verdict against plaintiffs for costs.

After backing out of Montrose, the steamboat pursued a northeasterly course toward the channel separating two submerged islands, Kimball Island and Dundy Island, but did not

pass into the channel, but attempted to cross over the end of Dundy Island, missing the channel about 25 feet, where the boat struck on a submerged stump, and sank in 12 or 15 feet of water. As said by the trial court in a written opinion, which we approve:

"The most that could be claimed for the plaintiffs' evidence was that it showed the boat left the landing at Montrose to go to Dallas City; that it struck a stump negligently left by the defendant some 25 feet outside the channel, between two submerged islands. There is nothing in the evidence from which it could be found, or even inferred, that those in charge of the boat were attempting to follow the channel, or that the boat, when it struck, was not exactly where they intended it to be. So far as the evidence shows, they may have intended to go directly over the submerged islands, in the course the boat actually took."

The pilot of the boat was not a witness, and we do not know from this record whether he was at the wheel at the time in question or not. All we have to enlighten us in this matter is the testimony of H. E. Steiner that "the boat was a licensed boat on the river; Edward Deitz was pilot, and his license hung in the pilot house of the boat, as required by law;" and "the pilots were in the pilot house." We are certainly not informed whether the man piloting the boat was attempting to go through the channel, and missed it, or whether he intended to go where he did go, over the submerged island. If it be said that, from the direction taken after backing out from the Iowa shore, it may be inferred that it was the intention of the pilot to go through the midchannel between the islands, their failure to find the channel, which plaintiffs claim was a safe and recognized passageway, was not skillful nor careful navigation. Certainly it would not be good navigation to avoid the channel and pass over a submerged island. The channel between Kimball Island and Dundy Island was 100 yards in width. The record also shows that there were several recognized routes or channels which those in charge of the boat could have taken, to go from Montrose to Dallas City. One—the only one which was marked by buoys—passed from Montrose around the south end of Dundy Island; one was the channel up the river between the Iowa shore

and Kimball Island; another, a channel around the lower end of Dundy Island, and then up the river, in the French channel; and the other we have already mentioned, as passing between the two islands. This latter route was the one usually taken by the ferry boats.

II. Plaintiffs rely upon *Casement v. Brown*, 148 U. S. 615, *Omslaer v. Philadelphia Co.*, 31 Fed. 354, and other cases cited, to sustain their position that they were not guilty of, but were free from, contributory negligence. We think that these cases, when carefully analyzed, do not support their contention. In the *Casement* case, the submerged pier that the barge struck was being constructed by defendants, as independent contractors, and, under the contract, defendants were to keep buoys over the piers while they were submerged, to warn boats of danger; and defendants omitted to replace a buoy, after it had been carried away by high water, after ample time to do so, and knowing of its necessity, and failed otherwise to warn of danger. The court found that it would place too severe a condemnation on the conduct of the pilots in charge of plaintiff's boats to say that, through error of judgment, their dependence on the appearance of the stream, and their reliance upon the duty of the defendants to place suitable buoys or other warnings, constituted such contributory negligence as would relieve the defendants from liability for the result of undoubted negligence.

In the case before us, there was no duty resting on the defendant to place and keep intact buoys or other warnings at or about the middle channel, or the edges thereof, between the two islands.

In the *Omslaer* case, a gas pipe was laid across the Allegheny River, resting on the bed of the river, wholly exposed. It was held that the pipe should have been buried underneath the river bed, and, as alleged, was a wrongful obstruction to navigation. A steamboat descending the river grounded her bow on a small, hidden lump, whereupon, the engines being stopped, the cross current swung the boat around until her bottom came into contact with and stuck fast on said gas pipe. It was held that the pilot was not culpable in not avoiding the lump; that the grounding on the lump was of no moment, as the boat would have swung or could have backed off, save for

her entanglement with the pipe. The libellants were held not to be guilty of contributory negligence, because they were acting in an *emergency,* and were not held to be responsible for a mere mistake of judgment.

III. The general rule stated in 1 Farnham on Waters & Water Rights 162 is:

"One who seeks to recover for injuries caused by the attempt to exercise the right of navigation must not contribute to his own injury. If he has been guilty of negligence which concurs in bringing the loss upon him, he cannot recover."

This general rule is announced, in substance, in many cases, and nothing to the contrary, so far as we know: that contributory negligence on the part of those in charge of a vessel will defeat recovery for injuries to a vessel, caused by a collision with an obstruction to navigation.

In *Atlee v. Packet Co.,* 88 U. S. (21 Wall.) 389, an action brought by the Packet Company against Atlee, for damages by reason of the destruction of a barge on a pier constructed by Atlee at Fort Madison, in the navigable part of the Mississippi River, the court, speaking of the care and skill required of those navigating a river such as the Mississippi River, said:

"The character of the skill and knowledge required of a pilot in charge of a vessel on the rivers of the country is very different from that which enables a navigator to carry his vessel safely on the ocean. In this latter case, a knowledge of the rules of navigation, with charts which disclose the places of hidden rocks, dangerous shores, or other dangers of the way, are the main elements of his knowledge and skill, guided, as he is, in his course by the compass, by the reckoning, and the observations of the heavenly bodies, obtained by the use of proper instruments. It is by these he determines his locality and is made aware of the dangers of such locality, if any exist. But the pilot of a river steamer, like the harbor pilot, is selected for his personal knowledge of the topography through which he steers his vessel. * * * He must be familiar with the appearance of the shore on each side of the river as he goes along. Its banks, towns, its landings, its houses and trees, and its openings between trees, are all landmarks by which he steers his vessel. The compass is of little use to him. He must know where the

navigable channel is, in its relation to all these external objects, especially in the night. He must also be familiar with all dangers that are permanently located in the course of the river, as sand bars, snags, sunken rocks or trees, or abandoned vessels or barges. All this he must know and remember and avoid.''

In this case, it appears that the pilot hugged the shore, and for this reason the accident occurred. In regard to this, the court says:

"There was a large expanse of deep water a hundred feet further out than where the vessel ran, which was safe; while there must always have been felt to be more or less danger of striking the saw logs or boom, or some other matter belonging to Atlee's mill, by hugging the shore at that point, even before the pier was built.''

In *The Lady Pike*, 21 Wall. (U. S.) 1, a barge was wrecked by striking an uncompleted pier of a bridge near Saint Paul. In holding that those in charge of the boat were solely responsible, the Supreme Court said:

"2. Attempt is made to excuse the master and pilot for endeavoring to pass midway between those piers, upon the ground that they did not know that it would be safe to pass over the pier on the starboard side; but the sufficiency of that excuse cannot be admitted, for two reasons: (1) Because they ought to have known both the dangers and the facilities of navigation before undertaking the responsible duties in which they were engaged. (2) Because it was their duty, if they believed that the pass in question was restricted to the distance between the two piers, to have taken the other pass, which the evidence shows has the width of one hundred and fifty-one feet. * * * 3. Unobstructed as the wider passage was, it was plainly a rash act to attempt to pass down the narrower passage on a course which brought the port side of the barge containing the wheat within five and a half or six feet of the pier on that side, which act can only be accounted for upon the ground of negligence and inexcusable ignorance of the dangers and facilities of the navigation, as it was evidently a hazardous experiment to attempt to pass between those piers, if the craft could not pass over the pier on the starboard side; and it is equally clear that it would have been safe to have steered between the piers

forming the wider passage, which, it seems, never occurred to the master or pilot.''

The court further said:

''Ship owners are responsible for such a disaster, if it results from the ignorance, unskillfulness, or negligence of the master or those in charge of the vessel.''

In *The Raithmoor* case, 186 Fed. 849, the steamship Raithmoor, passing up the Delaware River, came in collision with an anchored scow and pile driver, which were being used in the construction of a government beacon. The structure and vessels were 300 feet to the eastward of the regularly used channel, and were lighted; but the pilot testified that he did not see the lights until immediately before the collision. The court held that the steamship was in fault for being out of her course. In the discussion, the court said:

''In a word, the pilot either got out of the course mistakenly (which I believe to be the true explanation) or was trying to save time by cutting the angle of the ranges, instead of keeping in the channel. In either event, he was where he had no business to be, and the ship must take the consequences.''

Apropos to the situation in the *Raithmoor* case, the trial court in the instant case said, in his opinion overruling the plaintiff's motion for a new trial:

''There is nothing in the evidence from which it could be found, or even inferred, that those in charge of the boat were attempting to follow the channel, or that the boat, when it struck, was not exactly where they intended it to be. So far as the evidence shows, they may have intended to go directly over the submerged islands, in the course the boat actually took.''

In the instant case, the testimony of William Reinbold shows that the islands on either side of the midchannel were outlined by a growth of willows. The witness said:

''There was a little fringe of willows. There was a fringe of willows.''

Reinbold was asked whether there was anything to indicate where the points of these two islands were covering the channel, and whether he could see any objects on the surface of the

water; and he answered, "Yes, I think I could." When asked what "was there," he answered:

"Why, this undergrowth—little undergrowth of willows. Of course, they extended all up and down these islands."

In considering the former case growing out of the same accident as the instant case, *Watson v. Mississippi R. P. Co.*, supra, we quoted approvingly the following language of the trial court in reference to the duty of one in charge of a boat:

"In order to recover, in a case like this, the plaintiff must establish, not only that the defendant was negligent, but that the injury which he sustained came about without any negligence on his part, contributing thereto in any degree; and, unless these two facts are established, he cannot recover. If either of these facts is not established by the evidence, if he fails to establish both of these facts, it is the duty of the court to direct a verdict. No contributory negligence can be blamed on the defendant. But the plaintiff avers that a person has a right to navigate this whole river. There is no question about that; but, in the navigation of the river, he must exercise due care on his part, and he must follow the regular channel; and I think the law of the United States is that, if he goes out of this channel, he does so at his own risk; but, if he goes out of this channel without any fault on his part, the case is different."

After a careful consideration of the record and the authorities, we arrive at the conclusion that the plaintiffs failed to establish freedom from contributory negligence, and that the court did not err in sustaining the motion for a directed verdict in favor of the defendant, and in refusing a new trial. The judgment of the trial court is affirmed.—*Affirmed.*

STEVENS, C. J., EVANS and FAVILLE, JJ., concur.