BURDICK BERRY *vs.* WALTER ROSS, and another.

Lincoln.    Opinion June 15, 1900.

*Shipping.    Negligence.    New Trial.*

The owners of tow-boats are not common carriers nor insurers. Those who have the management of such boats are required to exercise reasonable care and caution and maritime skill. The tug is the dominant mind and will of the adventure. The master of the tow has no voice or volition in the construction of the tow or in its management.

It is the duty of the master of the tug to see that the tow is properly constructed, and that the lines are sufficient in quality and in length and securely fastened.

While employed in the waters of the home port of the tug, her officers are bound to know the channel, the shoals, the currents and the state of the tides and all risks and dangers incident to the employment and whether, in the state of the wind and water, it is safe and proper to come in with the tow.

A new trial will not be granted to permit the introduction of cumulative testimony, newly-discovered.

ON MOTION BY DEFENDANTS.

Action on the case for personal injuries sustained by the plaintiff, master of the schooner Ludwig Bill, by reason of the negligence of the captain of the defendants' steam tug, Ralph Ross, in towing the plaintiff's vessel on the fourth day of September, 1897, from Fort Point to Bangor.

Plea, general issue and the following brief statement by way of

special defense : That as a part of the contract of towage entered into between the parties as set out in the plaintiff's writ and declaration, it was understood and agreed between the parties that the Ludwig Bill should be towed astern of the Augustin Palmer by a line attached to the Palmer; that there was some probability that the Augustin Palmer might ground, and if the Palmer should ground, that the Ludwig Bill should sheer off and avoid a collision with the Palmer; that the plaintiff was fully advised as to how his vessel would be towed, of the risk of the Palmer grounding, of the necessity of keeping off his vessel, the Ludwig Bill, and avoiding a collision between the two vessels, and assumed the risks.

The jury returned a verdict for $3539.00 for the plaintiff.

The case is stated in the opinion.

*C. E. and A. S. Littlefield, and O. F. Fellows,* for plaintiff.

*C. F. Woodard,* for defendants.

The shortness of the line contributed to the consequences that followed and therefore contributory negligence on the part of the plaintiff.

"There may be cases where the danger about to be incurred is so very obvious that the master of the canal boat may be chargeable with contributory negligence in voluntarily exposing his boat to the peril without objection." *White* v. *Steam Tug Lavergne,* 2 Fed. Rep. 788, 793.

In the case of *Mason* v. *Steam Tug William Murtaugh,* 3 Fed. Rep. 404, it was held that the pilot of a tug showed want of ordinary care in attempting to cross the bay of New York with a boat in tow, while the hatches of such boat are uncovered, and the wind is blowing at the rate of about twenty-one miles an hour; and in the same case it was also held that the acquiescence of the master of the boat, who had had a long experience in crossing the bay at all seasons, constituted contributory negligence.

In the case of the *The M. J. Cummings,* 18 Fed. Rep. 178, it was held negligence on the part of the captain or pilot of the tug, to start on a trip with a tow, knowing that the tow was in a measure unseaworthy, that it steered poorly, and that the lake was rough, the wind strong, and the night was fast approaching. And

it was also held, that where the captain and owners of a canal boat and cargo permitted her to be taken as a tow, they having knowledge of all the facts stated, it was contributory negligence on their part.

The danger to be apprehended from too short a line was obvious, that in case the large vessel, the Palmer, should ground, so that her headway would be stopped, the smaller vessel drawing much less water, and so continuing afloat, would keep on and a collision ensue, unless the smaller vessel had room enough after the large vessel stopped to change her course and go out by the large vessel, and so avoid a collision.

This danger was as obvious to the plaintiff himself, and to any person having had experience with vessels and following the sea, as it could have been to the master of the tug. The question involved is not a question of technical or expert knowledge required only in towing vessels, or in the business of running tugs, but must have been a question of common knowledge to all persons familiar with the movement of vessels; and that the question was one of common knowledge to all persons familiar with the movement of vessels is shown in this very case, and by the conduct of the plaintiff's counsel in presenting their case.

The plaintiff himself having acquiesced in the use of the line of such length without a word of remonstrance, protest or suggestion that a longer line would be better, and having it wholly within his own power to have lengthened the line at any time, or to have refused to proceed with a line of such length, and as he could have enforced his refusal by casting the line off, he was guilty of contributory negligence. But the shortness of the tow line was not the cause of the accident. Plaintiff did not use reasonable care and skill to avoid it in the management of his vessel. Newly-discovered testimony is not cumulative (*Strout* v. *Stewart*, 63 Maine, 227; *Warren* v. *Hope*, 6 Maine, 479) "when the newly-discovered evidence relates to confessions or declarations of the other party as to some influential fact unknown to the petitioner at the time of trial, and inconsistent with the proofs adduced and urged by such party."

The plaintiff's leaving his wheel in the crisis was gross negligence. *Jonty Jenks*, 54 Fed. Rep. 1021.

It was contributory negligence on the part of the plaintiff to place himself in the position of peril in the narrow alley way between the rail and the house where he sustained the injuries complained of, and the only place, as the case shows, where he would have sustained any injury. While a person is justified under some circumstances in voluntarily placing himself in a position of danger, as for example in order to save life, or in the performance of a duty, or possibly under some circumstances even to save property, there must be a reasonable relation between the object sought to be attained and the chances of attaining it.

The test here is the same as in other cases: What one would be justified in doing is what a reasonably prudent and careful person would ordinarily do under the same circumstances. *Rexter* v. *Starin*, 73 N. Y. 601.

. . . . For a person engaged in his ordinary affairs, or in the mere protection of property, knowingly and voluntarily to place himself in a position where he is liable to receive a serious injury, is negligence which will preclude a recovery for an injury so received; but when the exposure is for the purpose of saving life, it is not wrongful, and therefore not negligent unless such as to be regarded as either rash or reckless." *Eckert* v. *L. I. R. R. Co.*, 43 N. Y. 505–6.

SITTING: WISWELL, C. J., EMERY, HASKELL, STROUT, SAVAGE, FOGLER, JJ.

FOGLER, J. This is an action on the case in which the plaintiff sues to recover damages for personal injuries sustained by him through the alleged negligence of the defendant's agent and servant, the master of their steam tug, Ralph Ross.

The plaintiff was the master and owner of the schooner Ludwig Bill, of the burthen of about fifty-nine tons. In the forenoon of September 4th, 1897, the Bill was lying at Fort Point Cove near the mouth of Penobscot River, the plaintiff being on board as master, bound for Bangor, light. The defendant's tug engaged

with the plaintiff to tow his schooner up the river to Bangor; and also engaged to tow to Bangor the large four-masted schooner, Augustin Palmer, coal laden and drawing 20½ feet forward and 21½ feet aft. About noon of that day the tug came alongside the Bill and took a line belonging to that schooner. The plaintiff testifies that the line was eighty fathoms in length and that he so informed Capt. Bennett of the tug. Capt. Bennett testifies that, as he remembers, the plaintiff told him the line was sixty fathoms in length, but he is not positive upon that point. The men on board the Bill payed out the line until orders came from the tug to "belay", when the line on board the Bill was made fast to her port windlass-bitts. The captain of the tug testifies that he did not give the order to belay until he was informed by those on board the Bill that the line was nearly run out. This was denied by the plaintiff and the men of his crew. The length of line payed out was estimated by the plaintiff and his witnesses as from thirty-five to forty fathoms, while Capt. Bennett and other witnesses for the defendant estimated the length to have been forty-five or fifty fathoms. The captain of the tug testifies that, before he started with the Bill in tow, he told the plaintiff that he should tow him astern of the Palmer and that the plaintiff must keep a good look-out, as the Palmer was likely to take bottom going up the river. The plaintiff denies that Capt. Bennett made such statement to him. Each is corroborated to some extent by their witnesses. The tug, with the Bill in tow, proceeded to where the Palmer lay. The end of the tow line upon the tug was then transferred to the Palmer and was made fast to the Palmer's starboard quarter. The tug with her tow then proceeded up the river at the rate of six or seven miles per hour. In the vicinity of Indian Point, a mile or so above Bucksport, there was a shoal in the river. There was testimony, on the part of the plaintiff, tending to show that at that point there was a current which ran diagonally across the river from the easterly to the westerly side. This was denied by the defendants, but it was admitted that the tide would hug the vessel towards the westerly shore. The captain of the tug testified that there was a log in the steamboat wharf at Bucksport which would indicate to

him the depth of water upon the shoal; that if he could see the log, he would know that there was not 21 ½ feet of water over the shoal; that if he could not see the log, it would indicate that there was that depth of water over the shoal. He testifies that as he, with his tow passed the steamboat wharf, he could see the log and, therefore, knew that there was not 21 ½ feet of water over the shoal. The tide was then running up at about half flood. Captain Bennett testifies that shortly after leaving Bucksport, he hailed the Bill, through the captain of the Palmer, to the effect that the Palmer would take ground, and that the plaintiff must keep well outside of her to avoid a collision, and that shortly before reaching the shoal he repeated the order to the Bill in the same way. In this he is corroborated by Capt. Haskell, master of the Palmer. The plaintiff testifies that he received only one such order and immediately upon receiving it he put his helm hard down as far as possible, and kept it so as long as he remained at the wheel. The Palmer grounded up on the shoal and stopped. The Bill forged ahead by reason of the momentum which she had acquired; the line by which she was attached to the Palmer became slack and in the water. Neither the captain of the tug nor the captain of the Palmer testified that the plaintiff did not put his helm hard down, but both testified that the Bill did not obey her helm as she ought to have done if her helm was in that position. As the Bill approached the Palmer, her bow was outside of the Palmer, but her stern drifted in towards the Palmer's starboard quarter. When his vessel was near the Palmer, so that a collision seemed inevitable, the plaintiff left his helm, seized a cork fender, and went into the narrow space, a foot and a half or two feet wide between his cabin and his port rail, for the purpose of lowering the fender between his vessel and the Palmer for the purpose of breaking the force of the collision. The plaintiff does not remember whether he succeeded in so placing the fender, but while he was in that position the port quarter of his vessel struck the starboard quarter of the Palmer by which his port rail and several stanchions were crushed in, and the plaintiff was caught between his rail and his cabin, by reason of which one of his legs was so crushed that ampu-

tation was necessary and the bones of the other leg were broken in two places.

The plaintiff contends that such injuries were received through the negligence and want of ordinary care of the master of the tug, in several particulars, the principal of which are first, that the line by which the Bill was attached to the Palmer was of insufficient length considering the nature of the channel and the risks liable to be encountered; that the line should have been seventy fathoms in length, and that if the line had been of sufficient length he would have been farther from the Palmer when the latter grounded, and could undoubtedly have avoided the collision; secondly, that it was negligence to attach the line on his vessel to the port bitts forward and to the starboard quarter of the Palmer; that if the line had been attached to the same side of each vessel he would have been better enabled to keep outside the Palmer; and, thirdly, that it was gross negligence upon the part of the captain of the tug, when he saw the state of the water by his log in the steamboat wharf to proceed with his tow, knowing that the Palmer would inevitably ground upon the shoal, and that he should have waited until the state of the tide was such that there would be sufficient depth of water on the shoal for the Palmer to pass.

In answer to this contention of the plaintiff, the defendants answer that the line by which the Bill was attached to the Palmer belonged on board the Bill and that the plaintiff made no objection to the length of the line put out, nor to the manner in which she was attached to the Palmer; and that the captain of the tug having informed the plaintiff that the Palmer was likely to ground and he must look out, that the plaintiff thereby assumed the risk of the Palmer's grounding and of all the consequences incident thereto; that the plaintiff was guilty of contributory negligence in not keeping his schooner outside of the Palmer, especially when so ordered by the captain of the tug; and that the plaintiff was guilty of further contributory negligence by placing himself voluntarily in a position where he would be likely to be injured if the vessels collided.

The owners of tow-boats are not common carriers, nor are they

insurers, and the law of those relations have no application here. The highest possible degree of skill and care are not required of them. Those who have the management of such boats are bound to bring to the performance of the duty which they assume, responsible skill and care, and to exercise them in everything relating to the work until it is accomplished. They are required to exercise reasonable care and caution and maritime skill, and, if these are neglected and disaster comes, the tow boat must be visited with the consequences. The tug is the dominant mind and will in the adventure. The master of the tow has no voice or volition in the construction of the tow or in its management. It is the duty of the master of the tug, as the captains of the tow have no voice in making up the tow, to see that it is properly constructed and that the lines are sufficient in quality and length and securely fastened. This is his duty whether the tug furnish the line to the tow or the tow to the tug. In the nature of the employment, the officers of the tug can tell better than the man in the tow what sort of a line is required to secure the vessels in tow and to keep them in position. While employed in the waters of the home port of the tug, her officers are bound to know the channel, the shoals, the currents and the state of the tide and all risks and dangers incident to the employment, and whether in the state of the wind and water it is safe and proper to make the attempt to come in with her tow. If it is not, she should advise waiting for a more favorable condition of things. *The Margaret*, 94 U. S. 494; *The Syracuse*, 12 Wall. 167; *The Quickstep*, 9 Wall. 665; *The James Gray* v. *The John Fraser*, 21 How. 184; *Sproul* v. *Hemingway*, 14 Pick. 6.

Applying these principles of law to the testimony in this case, we cannot say that the verdict of the jury was manifestly wrong or the result of bias, prejudice or mistake. As no exceptions to the rulings or instructions of the presiding justice are taken, we must assume that the case was submitted to the jury under proper instructions. The testimony in several particulars is conflicting. The jury saw and heard the witnesses and decided the case, and their finding must stand.

The defendants contend strenuously that the plaintiff in leaving

his wheel and placing himself in the narrow space, between his cabin and the rail of his vessel, was guilty of contributory negligence. This must be considered in the light of the circumstances and exigencies of the case. When he left his wheel the two vessels were but a short distance apart. Captain Haskell of the Palmer testifies that the distance was about fifty feet. While the bow of the plaintiff's vessel was outside the Palmer, his stern was being drawn by the current or tide toward the Palmer's starboard quarter. It is not probable that a collision could have been averted by the use of the rudder. Although, as the jury found, the plaintiff was placed in this dangerous position through the negligence of the master of the tug, it was still his duty to do everything that he reasonably could to save the two vessels from injury. Had he failed to do this, he would have been guilty of negligence and responsible for the consequences. He had no time for calm deliberation, but must act, if he acted at all, at once. Seemingly the only thing he could do was to place a fender between the two vessels and thereby diminish the force of the collision. The use of a fender, if practicable, is usual in case of an impending collision between vessels. This the plaintiff, in the emergency in which he was placed, undertook to do. Was his action justified under the circumstances? The jury answered that question in the affirmative and we do not feel justified in reversing their decision.

We do not think the motion of the defendants for a new trial by reason of newly-discovered testimony can be sustained. The testimony upon which the defendants rely in this respect is that of Joseph H. Gilley and his wife, Lydia J. Gilley, to whose house the plaintiff was immediately taken after the accident, where he remained until he was able to be removed some four months afterwards. The fact that the plaintiff was at the house of these witnesses was known to the defendants, as one of them visited him there. We think by the exercise of due diligence the defendants might have discovered the testimony of these witnesses before the trial.

It is well settled that a party will not be granted a new trial on account of newly-discovered testimony when such testimony was

known to him, or by the use of due diligence might have become known to him.

"A new trial, to permit newly-discovered evidence to be introduced, should only be granted when such testimony is not cumulative and when there is reason to believe that the verdict would have been different if it had been before the jury." *Handley* v. *Call*, 30 Maine, 19; *Ham* v. *Ham*, 39 Maine, 263.

Cumulative evidence is additional evidence of the same kind, to the same point. *Glidden* v. *Dunlap*, 28 Maine, 379; *McLaughlin* v. *Doane*, 56 Maine, 290; *Parker* v. *Hardy*, 24 Pick. 246.

The testimony of Mr. and Mrs. Gilley, which the defendants claim was newly-discovered, was to the effect that the plaintiff while at their house made certain statements or admissions, which it is claimed were inconsistent with his right to recover in this suit. This testimony was cumulative, as testimony of the same kind and to the same point was introduced at the trial by the defendants. The testimony of these witnesses, upon which the defendants especially rely, is that the plaintiff said in their presence that he did not consider Captain Bennett to blame in the least, that he had no one to blame but himself for the accident. Whether the captain of the tug was in fault, and whether the plaintiff was to blame, is not dependent upon any opinion of either of those parties, but is to be determined by the facts proved.

*Motions overruled.*