ALICE SAVOY *vs.* JAMES McLEOD.

Penobscot.   Opinion November 5, 1913.

*Accidents.   Automobile.   Chauffeurs.   Contributory Negligence.   Damages.*
*Danger.   Diligence.   Due Care.   Highways.   Negligence.   Owners.*

1.  It is a matter of common knowledge that all adults of ordinary prudence
    do not always immediately do the right thing, or exercise the best judg-
    ment in cases requiring quick thought and quick action.

2.  In view of this habit, due to the inherent frailties of human nature, the
    law requires that degree of diligence which constitutes due care, to be
    commensurate with the danger to be avoided.

3.  A driver of an automobile, in the public highways constantly traveled by
    pedestrians and teams, and occupied by children, should, to establish due
    care, exercise so high a degree of diligence in observing the rights of foot
    passengers, or teams, when approaching them, as to enable him to control
    it or stop it if necessary, to avoid collision, which cannot be regarded as
    a pure accident or due to contributory negligence.

4.  Drivers of automobiles should be required to do everything that human
    agency can do to avoid taking human life.

On motion by the defendant.   Motion overruled.

This is an action on the case to recover damages for personal
injuries sustained by the plaintiff in consequence of the negligence
of the defendant.   The accident occurred on the 22d day of Sep-
tember, 1912, on Center Street, in the City of Bangor.   The plaintiff
claimed that while riding in a carriage on said street, the defendant,
riding on and along said street in an automobile, ran into and against
the carriage in which she was riding, overturning the same and
throwing her out of said carriage on to the ground, causing the
injuries complained of.   The defendant plead the general issue.

The jury returned a verdict for the plaintiff for $975, and the
defendant filed a general motion for a new trial.

The case is stated in the opinion.

*D. I. Gould, and Edgar M. Simpson,* for plaintiff.
*Fellows & Fellows,* for defendant.

SITTING: SAVAGE, C. J., SPEAR, CORNISH, KING, BIRD, PHILBROOK, JJ.

SPEAR, J.   It would be of little avail to analyze the testimony in this case on the question of liability.  The report shows that there was ample room for the defendant to have guided his machine safely past the team in which the plaintiff was riding, had he been paying proper attention to the rights of the team.

In view of the accidents and tragedies that are daily occurring in the operation of automobiles, the present case seems an available opportunity for a statement of the familiar rules of law with more definite application than has yet been announced in this State, to the duty of persons who undertake to drive upon the public highways, the engine of power and peril, now represented in the mechanism of the automobile.  If not strictly a matter of judicial notice, it is a matter of common knowledge, that death and injury are of daily occurrence due to the inefficiency, negligence or reckless conduct of those who are permitted to engage in the operation of these powerful machines.  A mania for speed seems to have seized the minds and dominated the action of many of the automobile operators, whether owners or chauffeurs.  This class of drivers apparently assume that the foot passenger or team will, upon their approach, so hastily change its course, as to relieve the operator from any diminution of speed, that he may have his machine under control, and avoid accident, if the unexpected happens, and the passenger or vehicle or child does not, as quickly as anticipated, o¹ ey the mandate of his whistle or horn.

It is also a matter of common knowledge that all adults of ordinary prudence do not always immediately do the right thing, or exercise the best judgment, in cases requiring quick thought and quick action.  This failure of men to act alike, under like circumstances, is so general in its application, that it must be regarded as a habit, which all persons, coming in contact with human action, must be held to anticipate as an existing condition.  In view of this habit, due to the inherent frailties of human nature, and the rule of law, that the degree of diligence deemed in law sufficient to constitute due care, is always commensurate with the danger to be avoided, it is the opinion of the court that the driver of an automobile in the

public highways, constantly travelled by pedestrians and teams and occupied by children of all ages, should, to establish due care, exercise so high a degree of diligence in observing the rights of a foot passenger or team when approaching them, as to enable him to control it, or stop it if necessary, to avoid a collision, which cannot be regarded as a pure accident or due to contributory negligence.

But it may be claimed that this rule of diligence renders the operation of automobiles impracticable. If so, let the business stop. They should be required to do everything that human agency can do to avoid taking human life. This court declared in *Cameron* v. *Street Railway,* 103 Maine, 482, that "the court should establish as a law the rule which prevents injury or loss of life rather than that which invites or even permits it. This rule is based upon reason and public policy." But the claim of impracticability is not well founded. Prudent drivers neither kill children nor injure men, except at very rare intervals, and then only in cases of unavoidable accident or contributory negligence. But whatever the result, these requirements are essential to an effective rule of safety, and are in harmony with the rights of travelers upon the highway, and of children in the streets, however they may come there.

But no new principles of law have been evolved for express application to the operation of automobiles. We have simply endeavored to apply the well known principles of law in a specific way to this class of cases, as has been done in the case of steam roads and electric cars. The foundation of every principle of law invoked is found in what might be regarded as a legal maxim—the very foundation of the rule underlying the doctrine of due care and negligence—that in all human action involving hazard, the law imposes the duty of using such diligence, as is commensurate with the danger to be avoided. This rule applies to the operation of steam railroads upon the ground of public policy and safety, and finds expression in *Libby* v. *Maine Central R. R. Co.,* 85 Maine, 34, in this language: "This law requires common carriers of passengers to do all that human care, vigilance and foresight can, under the circumstances, considering the character and mode of conveyance, to prevent accident to passengers. To require anything less would be to leave the lives of persons in the hands of the reckless, and unprotected against the negligent and incautious."

The same rule applies to the operation of street cars and automobiles, except that the degree of diligence required is varied to correspond with the diminished danger. *Marden* v. *Street Railway,* 100 Maine, 41; *Towle* v. *Morse,* 103 Maine, 250; *Gurney* v. *Piel,* 105 Maine, 501. It requires no further citations to show that it is a well established rule that great danger requires great vigilance.

That the modern motor car, equipped with engines developing from twenty to eighty horse-power, capable of reaching a speed of from twenty to eighty miles an hour, and moving with such force that no ordinary obstacle can resist it, is a mechanism, the operation of which in the public streets is of a highly dangerous character, is so apparent that the mere statement of the facts is equivalent to proof.

Upon the application of these rules of law to the case before us, the conduct of the defendant, in operating his automobile, as he did, was the approximate cause of the accident and an act of negligence. The road was amply wide to enable him to pass the team without collision. The team was moving slowly towards him and in full view. According to his own testimony when within thirty-five to seventy-five feet of the team he requested it to give him a little room. His wife says that when they noticed the team coming he "gave two blasts of the horn, hollered to them to get out of the way, and they didn't pay any attention to it." Notwithstanding this situation, as disclosed by the defendant's own testimony, he drove directly in collision with the team in which the plaintiff was riding. His own evidence also shows beyond question, that his car was under such control when approaching this team, that, had he so willed, he could have stopped it several times, if need be, in the distance of thirty-five feet.

In view of the momentum of a machine as against that of a team, it was the duty of the defendant to observe the action of the team, and, even if it did not turn out at all, or became stationary, if he did not have room to pass, to have stopped his car and requested the team to turn out, rather than keep on driving and come in collision with it.

The jury, upon the evidence, had a right to find that the team pursued a direct course; that it did not suddenly swerve into the machine; that it did nothing to mislead the defendant as to its

course; that it was plain to ordinary observation that the team was not turning out; that there was ample room for the car to pass without its turning out; that the team had a right to assume that the car would avail itself of the ample opportunity to pass in safety; and that, under the circumstances, the team was not guilty of negligence in keeping a direct course along the street. The verdict upon the question of liability was amply warranted.

The question of damages presents a more difficult task. Yet, upon a careful investigation of the evidence, we do not feel authorized to say that the verdict is so excessive as to warrant the intervention of the court. The assessment of damages in this class of cases is always an estimate, based upon the good judgment of the jury or of the court, as the case may be. There are no fixed rules that can be applied to the determination of such an assessment. Probably no two juries would assess the same amount of damages in any given case. Nor is it at all improbable that the members of the court might materially disagree as to what would be a proper measure of damages in a given case. A verdict, however, must within reasonable limits, be based upon the testimony. We think the jury acted within the rule, if they believed the testimony of the plaintiff and her witnesses, and cannot be regarded as having been influenced by bias, prejudice or mistake in awarding the verdict rendered.

And it should be here remarked, in view of the defendant's medical testimony, that the jury could not be accused of bias, prejudice or lack of judgment in discarding it as evidence of sufficient value to influence their minds upon the question of damages. It is certainly a source of much regret that medical men of high standing and great learning, will often assume a position on the witness stand, as medical experts, that brands their testimony as absurd, if not ridiculous. In the testimony of one of the defendant's physicians were found the following questions and answers: Q. Doctor, if you knew that a woman was thrown out, or thrown down from a buggy on to the hard ground, as it is between the rails of an electric road, and you were called to attend her immediately after the accident, say in the neighborhood of an hour, and you found her vomiting, and she continued to do so intermittently for two days, what would you attribute that to? A. Wouldn't know what the cause was. Q. You wouldn't know what caused it? A. No. Q. But

there would be in your mind some cause for it? A. I imagine there was, yes. Q. Now, Doctor, suppose that this woman described in my previous question, up to the time of this accident had been well and rugged, and a large, corpulent woman, and had not been vomiting, and you knew that when you called to see her, what would you attribute the vomiting to. A. She hadn't been vomiting? Q. No, hadn't been vomiting before the accident, big, strong, rugged woman; but when you called you found her vomiting? A. I don't know what would cause it. Q. Would it be probable that the accident caused it? A. I imagine it might have shaken her up or something like that, that caused her to vomit.

Comment is unnecessary. Res ipsa loquitur. Such evidence is so absurd and unnatural, that neither the court nor the jury would be justified in according to it any particular value in an effort to ascertain, from the testimony, the real injuries inflicted upon the plaintiff by the accident.

Notwithstanding this testimony, we have no doubt that the immediate symptoms manifested by the plaintiff were the result of the injuries caused by the accident. But whether the pelvic conditions disclosed by the operation were thus caused, we have grave doubts; and it is clear that the jury had similar doubts, else the verdict would have been much larger. However this may be, it seems quite evident that, even if the conditions found were chronic, the injuries operated as an exciting cause to produce immediate results that, without the injury might have slumbered indefinitely. The medical testimony fairly establishes this conclusion. Much force must also be given to the undisputed evidence that the plaintiff immediately, and for a long time, prior to the injury was in average health and well nourished, weighing 175 pounds. If this be true, and the condition in which it is conceded she was found, succeeding the accident, can be attributed to the injuries then received, the court does not feel justified in revising the action of the jury.

*Motion overruled.*