KENNEBEC TOWAGE COMPANY *vs.* STATE OF MAINE

Kennebec.    Opinion, March 31, 1947.

*McLean, Southard & Hunt,* for plaintiff.

*Ralph W. Farris,* Attorney General,

*Abraham Breitbard,* Deputy Attorney General, for defendant.

SITTING: STURGIS, C. J., THAXTER, MURCHIE, TOMPKINS, FELLOWS, JJ.

FELLOWS, J. This is an action to recover damages to the

plaintiff's tugboat "Seguin," through collision with an alleged hidden underwater obstruction, in the draw channel of the Richmond-Dresden Bridge. The jury in the Superior Court for Kennebec County returned a verdict for the plaintiff for $5,200.00. The case now comes before the Law Court on the State's exceptions to a portion of the charge, and on general motion by the State for a new trial. The action was brought by virtue of a legislative resolve, whereby the State waived its immunity to suit, and authorized an action at law with the "liabilities of the parties the same as the liabilities between individuals." Resolves of 1945, Chapter 12.

It fairly appears that on the morning of June 18, 1940 the tug "Seguin" left Bath for Augusta, having in tow the barge "Bast." The tug was on the starboard quarter of the barge, and fastened to the barge by tow line, backing line, and breast lines. The breadth of the "Seguin" was about 20 feet and its length 80 feet. The registered breadth of the "Bast" was 35.6 feet and its length 170 feet. The barge was loaded with about 650 tons of soft coal.

The vessels thus tied together, proceeded northerly up the Kennebec river to the channel on the easterly side of Swan Island. The Richmond-Dresden Bridge, built by the State and crossing the Kennebec, is situated near to and northerly of Swan Island. At this point in the River, where the waters of the channel on the westerly side of Swan Island join the waters on the easterly side, the current is often unsteady, with a possible tendency towards the easterly side of the river, and described as a "tricky" or "witch current." At the time, it was flood tide, the wind was "fresh southwest," and the current was running up the river at a rate of about one and one half miles per hour. The vessels were going slowly, and were being steered in a manner to "line up the draw." The captain of the tug was at the wheel, and because the bow of the barge obstructed his view of the channel, the mate was stationed at the bow to signal the course.

There was a passageway, through the draw channel of the bridge, that was apparently 70 feet wide. The total width of barge and tug was about 56 feet. The draw pier on the west was protected by a plank wall or "apron" filled with stone. The bridge pier on the east side of the draw channel had several "dolphins," or near-by clusters of piling driven into the river bottom, to indicate the course, and to protect the passing ship, as well as to protect the bridge. The total length of barge and tug as lashed together was approximately 180 feet, and the length of the westerly draw pier, that held the movable part of the bridge, was about 50 feet. The captain could seemingly allow, while in the draw bridge channel, for a possible side movement due to winds or current of fourteen or fifteen feet, in going forward the necessary 230 feet to clear the draw. The apparent safe width of the draw channel, however, of 70 feet, through which the vessels passed, was in fact about four feet less.

It appears that in the repair or reconstruction of the pier east of the draw channel, in 1938, the abutment or underwater portion of the pier was increased in size about three feet by putting concrete around it, and around this concrete some steel sheeting projected an additional five inches. The top of this repair work was at low water level. Also, six or eight inches below the top of the steel sheeting was an eight by eight oak timber, or "waling," fastened horizontally on the sides of the abutment. The sheeting and waling were used during reconstruction but were not entirely removed. This underwater projection, with the sheeting and waling, which extended about four feet into the draw channel, could not be seen when the water was above the low tide level. At the time of this accident the water was at about half tide.

The tug and barge proceeded slowly, and, as claimed by the plaintiff, only fast enough to maintain their course. They were passing so near to the westerly or draw pier, that the barge struck the corner of the plank apron of the westerly pier, placed

to protect the pier. The impact threw the tug and barge across the narrow channel and against the downstream dolphin near to and southerly of the easterly pier. The tug then speeded up in order to straighten out, and immediately struck the unseen underwater projection in the easterly part of the draw channel, which crushed in her planking and caused the tug to sink soon after passing through the bridge. Witnesses for the plaintiff testified that this downstream dolphin, at the time of the accident, was improperly placed and did not indicate or protect the underwater obstruction, but was in line with the top portion of the pier. The State denied this, and claimed that the dolphin was properly placed, and that the cause of injury was the negligence of the tugboat captain.

## EXCEPTIONS

The presiding Justice, in his charge, said to the jury:

"If the State was responsible for this, how much did it damage this plaintiff? It is not for me to say. It is for you. I say this to make myself clear to you. The evidence as I remember it, is that damage was $7,200. If it is different from that—if there is other evidence to show it was more or less—it is whatever the evidence shows. But my memory is—and don't depend upon my memory—my memory is one gentleman said—the owner of the tug or someone else— that the amount of the damage was $7,200. Frankly—and if I am wrong, I know one of the gentlemen will correct me —frankly, I believe if you come to damage, you should make the damage $7,200; but it is your province, I myself, remember no contradictory evidence."

At the conclusion of the charge, and before the jury went out, the Attorney General stated:

"The defendant takes exception to the statement of the Presiding Justice to the jury when he says if they find damages for the plaintiff it would be $7,200."

The Court then immediately said:

"Did I say that? I want to qualify it. Disregard what I said. It is not for me to say what damages are. I thought I was shortening some of your work, but I have no right when objected to. It is for you to find damages from evidence presented here—if you get to damages. You are to find it from all the evidence and from inferences and exhibits; and I tell you distinctly as far as the Court is concerned, the damages are not $7,200 nor 72 cents—it is not the Court's business. Perhaps I should not have invaded your province. I repeat and will exaggerate so there will be no misunderstanding. It is for you to say what the damages are from all this evidence."

No exception was taken to the corrected instruction.

Evidence of value of the tug before and after the accident came in part from a vice-president and treasurer of the plaintiff company, who placed the total damage at $7,200. The members of the jury were of course not obliged to accept this amount, and the Court plainly so stated. They were at liberty to consider the evidence of all facts and circumstances in the light of their knowledge and experience. Damages cannot always be reduced to mathematical computation. There are no rules that furnish an absolute guide for the discretion of a jury. *Savoy* v. *McLeod,* 111 Me., 234, 238, 88 A., 721, 48 L. R. A. (N. S.) , 971. If they did not believe a witness they could disregard his testimony. It was for the jury to determine what damage, if any, was the natural, reasonable and direct result of any unlawful act. As stated in the corrected instruction, if any liability, the jury should "say what the damages are from all this evidence." *Collins* v. *Kelley,* 133 Me., 410, 170 A., 65; *Moore* v. *Daggett,* 129 Me., 488, 150 A., 538; *Topsham* v. *Lisbon,* 65 Me., 449.

The presiding Justice had a right, during the trial, and before the case was committed to the jury, as well as a duty, to correct

or explain any statement he may have made. *McKown* v. *Powers,* 86 Me., 291, 296, 29 A., 1079; *Skene* v. *Graham,* 116 Me., 202, 100 A., 938; *Jameson* v. *Weld,* 93 Me., 345, 45 A., 299; *Coombs* v. *Mason,* 97 Me., 270, 54 A., 728. It is "incumbent on a judge to see that no misconception arises in their minds because of any statement of his." *State* v. *Shannon,* 135 Me., 325, 328, 196 A., 636, 637. There was perhaps no chance of misunderstanding by the jury here. It was told to fix the amount, "It is not for me to say. It is for you." If the inadvertent statement of the presiding Justice, to the effect that the evidence indicated $7,200 damage, could be understood as an instruction to find $7,200, the correction was fully and clearly made. The verdict itself indicates this. The verdict was not as estimated by a witness, and as referred to by the presiding Justice. It was much less. The jury understood and gave heed to the correction, if it had any "misconception," and if any correction was necessary. The exception is not valid.

## MOTION

By the terms of a Resolve, the Legislature gave permission to the plaintiff Towage Company to bring an action at law against the State, in the Superior Court for Kennebec County, according to the "practice," "proceedings" and "liabilities" as in cases "between individuals." Resolves of Maine for 1945, Chapter 12.

In this action for alleged negligence, therefore, it was the duty of the plaintiff company to prove to a jury by a fair preponderance of evidence that the defendant State was negligent, that as a result of this negligence the company suffered damage to its property, and that no negligence on its part contributed to the injury. *Blumenthal* v. *B. & M. R. R.,* 97 Me., 255, 54 A., 747; *Edwards* v. *Express Company,* 128 Me., 470, 148 A., 679; *Baker* v. *Transportation Company,* 140 Me., 190, 36 A., 2d, 6; *Adams* v. *Richardson,* 134 Me., 109, 182 A., 11; *Lesan* v. *M. C. R. R. Co.,* 77 Me., 85. The standard of measure-

ment is, that care and caution exercised by a person who is ordinarily prudent and thoughtful. One who falls below this level, when in dangerous circumstances, is negligent. The law does not expect the impossible, but it does expect average, usual, and ordinary care.

This "due," "ordinary" or "reasonable" care and caution, that the law requires, is the care that reasonable and prudent men use in respect to their own affairs under like circumstances. *Raymond* v. *Railroad Co.*, 100 Me., 529, 62 A., 602, 3 L. R. A. (N. S.), 94. As a practical proposition this "ideal" man of ordinary foresight and prudence is usually a composite picture drawn from the combined ideas, knowledge, feelings, and experiences of the members of a jury, which picture may exonerate from blame, or fix a liability. Negligence, therefore, is the failure, in the opinion of a jury, to act as would the usual and prudent man of ordinary intelligence.

Under its motion for a new trial the State must show that the jury verdict was so manifestly or clearly wrong that it is apparent that the conclusion of the jury was the result of prejudice, bias, passion, or a mistake of law or fact. *Eaton* v. *Marcelle*, 139 Me., 256, 29 A., 2d, 162; *McCully* v. *Bessey*, 142 Me., —; 49 Atl. (2d), 230; *Marr* v. *Hicks*, 136 Me., 33, 1 A., 2d, 271.

The law recognizes that to leave a concealed and unprotected underwater obstruction in a navigable channel may be negligence. Navigable rivers are common highways which persons have a right to use as they use other highways. While a bridge itself may obstruct free use, the legislature, with consent of the Federal Government, may authorize construction of a bridge over navigable tidal waters upon conditions, such as proper draw channels, and the like. *State* v. *Freeport*, 43 Me., 198; *Commonwealth* v. *Charlestown*, 1 Pick. (Mass.), 180; 11 Am. Dec., 161; The Nonpareil, 149 Fed., 521; *The Philadelphia R. R. Co.* v. *Towboat Co.*, 64 U. S. (23 How.) 209; 16 L. Ed., 433; *Tuell* v. *Inhabitants of Marion*, 110 Me., 460, 86 A., 980,

46 L. R. A. (N. S.), 35; *Patterson* v. *East Bridge in Belfast,* 40 Me., 404; 4 Ruling Case Law "Bridges," 195, 197; 8 Am. Jur., "Bridges," 913, 915.

In this case the record shows that the legislature of Maine authorized, by Chapter 188 of the Private and Special Laws of 1929, the construction of this bridge across the Kennebec river, with a draw to be satisfactory to the War Department. It also shows that the War Department approved plans for construction and for repairs of the bridge with not less than 69 foot draw channel, on condition that "free navigation of the waterway shall not be unreasonably interfered with; that the present navigable depths shall not be impaired; and that the channel or channels through the structure shall be promptly cleared of all falsework, piling, or other obstruction placed therein or caused by the reconstruction of the bridge."

The defendant State of Maine, through its Attorney General, contends that the damage to the *Seguin* was not caused by the unseen obstruction, but was caused by the negligence of the master of the tug, who, carelessly, or through bad judgment or lack of skill, steered too far westerly, and struck the apron or fender of the draw pier, with great force, which "threw" or "bounced" the vessels to the right against the dolphin, and thus, breaking the piling, permitted the tug to hit the underwater projection on the abutment. In other words, the State says that whether there was an underwater obstruction extending four feet into the channel, or no obstruction, is immaterial. It claims that the evidence shows that the damage resulted through a series of events beginning with the plaintiff's negligence in hitting the crib or apron of the draw pier in a severe and careless manner.

The Plaintiff company, alleges and claims that leaving a concealed, unauthorized, and unprotected obstruction in the draw channel was negligence, and the sole reason for the damage. The plaintiff further says there was no negligence on its part that either caused or contributed to the injury; that

it was necessary to pass very close to the draw pier because of wind and current; that to strike the apron of the pier in a slight manner as here, was not negligence, and that the apron and dolphin were intended and placed to care for just such an incident.

The towing of vessels in a navigable river is a well known and distinctive business, and due care must of course be at all times exercised by the master, or directing agents, of a tugboat. The negligence of a master that brings about a collision, or contributes to an injury, will prevent the recovery of damages by the owners. The highest degree of skill and care are not required. The master of a tugboat is required to exercise "reasonable care, caution and maritime skill." *Berry* v. *Ross*, 94 Me., 270, 47 A., 512; *Cumberland County* v. *Tow Boat Co.*, 90 Me., 37 A., 867, 60 Am. St. Rep., 246; The Nonpareil, 149 Fed. (D. C.) 521; *Steiner* v. *Mississippi River Co.*, 194 Ia., 647, 190 N. W., 9, 25 A. L. R., 1551, and note.

No exceptions were taken to the portions of the Charge relating to duties and rules of care and it must be assumed that the jury were properly instructed. *Frye* v. *Kenney*, 136 Me., 112, 3 A., 2d, 433; *Eaton* v. *Marcelle*, 139 Me., 256, 29 A., 2d, 162.

The plaintiff's tugboat was to pass with barge in tow through the draw bridge channel. There was an unseen obstruction in the channel. The barge struck the protective apron of the westerly pier and swerved across to hit the dolphin and the submerged obstruction. Was there negligence on the part of the State? Were the servants of the plaintiff company at fault? If known to the company agents could the obstruction have been avoided by the exercise of due care? What was the real or proximate cause of the damages received? Did the negligence of the tugboat captain, if there were negligent acts on his part, contribute to the injury to the boat? If the damage was done through the fault of the State, what was the amount of damage? These and similar questions were answered, by the jury verdict.

This case with its sharply contested facts, involving means and methods of river navigation and the construction and use of a highway drawbridge, is one that a jury,—and especially a jury composed of Maine citizens,—should be able to fairly and properly decide. The jury had the opportunity, that this Court has not, to see and hear each witness and to note his appearance and his manner on the stand, to consider any of his hesitations or embarrassments, and to observe other unprinted things that might or might not indicate intelligence, knowledge, memory, power of observation, fairness, truthfulness and reliability. The Court has carefully examined the record, and from the record cannot say that the verdict was "manifestly" wrong.

*Exceptions overruled.*
*Motion overruled.*