## MARTELL BROTHERS, INC.

v.

## DONBURY, INC.

Supreme Judicial Court of Maine.

Argued June 13, 1990.

Decided June 29, 1990.

E. Stephen Murray (orally), Murray, Plumb & Murray, Portland, for plaintiff.

Ricky Brunette (orally), Brunette, Shumway & Ryer, Portland, for defendant.

Before McKUSICK, C.J., and WATHEN, GLASSMAN, CLIFFORD, COLLINS and BRODY, JJ.

COLLINS, Justice.

This case was originally brought before the Superior Court (Sagadahoc County, *Lipez, J.*) on the complaint of a commercial and residential painting company, Martell Brothers, Inc., and its two owners, Joseph and Gregory Martell, (collectively, "the Subcontractor"), alleging a material breach by a general contractor, Donbury Inc. ("the Contractor"), of a subcontract between the two parties, and on the counterclaim brought by the Contractor alleging a material breach by the Subcontractor of the same subcontract. The Superior Court entered judgment on a jury verdict in favor of the Subcontractor. The Contractor now brings this timely appeal, arguing that the Superior Court erred by denying its two

motions for a directed verdict, its motion for a judgment notwithstanding the verdict and its motion for a new trial. We find no error and we affirm.

I.

Martell Brothers, Inc., is and has been for the past six years an interior and exterior painting contractor that performs commercial and residential jobs. On October 31, 1985, the Subcontractor executed a subcontract with the Contractor, Donbury Inc., a general contractor, to paint the interiors and exteriors of a 23 building, 115 unit apartment complex under construction in Portland.

Painting under the subcontract was scheduled to commence on March 9, 1986, and to be completed by September 1, 1986. Joseph Martell testified that the painting job was plagued throughout the spring and summer by delays caused by buildings and units not being prepared for painting as scheduled, by changes in plans for the colors and types of paints to be used, and by a constant need to go back and repaint areas damaged by structural problems unrelated to the Subcontractor's previous work. The original specifications submitted to the Subcontractor called for two coats of stain to be applied to the exterior clapboards of the buildings. On June 11, 1986, the owner ordered a change in the painting system from the two coats of stain to one coat of oil-based primer and one coat of latex finish. The oil-based, latex-finish painting system permitted the resin to bleed through the paint, however, and after 5 buildings were completed either the owner or the Contractor put a stop to the painting. On August 18, 1986, the owner authorized the Contractor to tell the Subcontractor to paint portions of two buildings with an oil-based primer and an oil-based finishing coat as an experiment to see if two coats of oil paint would work better. The Subcontractor completed this painting as requested. No further painting was done until September.

Paul Laliberte, the Vice President of the Contractor, admitted on cross examination that sometime during the second week of

September, 1986, the Contractor telephoned another painter and solicited a price on how much the contacted painter would charge to finish the painting job. There was no evidence presented, however, showing that the Contractor hired another painter prior to September 23, 1986.

On September 18, 1986, a meeting was held between the Subcontractor and the Contractor at which the Contractor told the Subcontractor that no money was then due to the Subcontractor. The Contractor also told the Subcontractor that the Contractor "was losing money on the job and therefore [the Subcontractor] should accept the fact that [it] may lose money or break even on the job."

Also on September 18, 1986, the Contractor sent a letter to the Subcontractor stating that the owner had authorized painting the exteriors of the remaining unpainted buildings with the two-coat, oil-based system by November 1, 1986. The letter further demanded that the Subcontractor repaint the five buildings on which the paint had bled by November 1. The letter closed by stating that if the Subcontractor refused to complete this work by the specified time, the Contractor would hire another painter and hold the subcontractor responsible for the difference in cost. A response to the letter was demanded by the next day. The Subcontractor did not respond to the letter.

On September 23, the two Martell brothers, their foreman, and one worker were on the job site. One of the Martells was taking photographs. The Contractor walked over to them and politely ordered them to leave the job. The Subcontractor treated this order to leave as a termination of the contract by the Contractor.

The Subcontractor sued the Contractor and the owner of the housing project for breach of the subcontract, among other things. The Contractor counterclaimed, alleging that the Subcontractor breached the subcontract. At trial before the Superior Court, the Contractor unsuccessfully moved for a directed verdict twice. The jury returned a verdict finding that the Contractor had breached the subcontract, and awarding damages to the Subcontractor in the amount of $58,195. Judgment was entered on this jury verdict, and the Contractor's motions for a judgment notwithstanding the verdict and a new trial were denied. This timely appeal followed.

II.

We direct our attention first to whether the Superior Court erred by denying the Contractor's two motions for a directed verdict and its motion for judgment notwithstanding the verdict. When reviewing the trial court's denial of the defendant's motion for either a directed verdict or a judgment notwithstanding the verdict, we examine the evidence in the light most favorable to the plaintiff and determine whether any reasonable view of the evidence, including all justifiable inferences to be drawn from that evidence, can sustain the verdict. *Schiavi v. Goodwin*, 542 A.2d 367 (Me.1988); *Buchanan v. Martin Marietta Corp.*, 494 A.2d 677 (Me.1985).

■ The evidence, viewed in the light most favorable to the Subcontractor, supports a finding that the Contractor terminated the subcontract on September 23rd by ordering the Subcontractor to leave the job, thereby materially breaching the subcontract. The evidence concerning the events of September 23rd must be viewed in the light of the other competent evidence presented indicating the state of the business relationship between the parties at the time. Joseph Martell testified that at the meeting on September 18th Paul Laliberte told Martell that "he wasn't going to pay us what we had due us; he told us that we weren't due the money." Although there has been no showing in the record that money was in fact then due to Martell, Laliberte's statement indicates that the relationship between the parties was, as both parties agree in their appellate briefs, becoming tense. Martell also testified, as discussed above, that Laliberte "told me personally that he was losing money on the job and therefore we should accept the fact that we may lose money or break even on the job." Although this statement was not a clear and unequivocal declaration that the

Subcontractor would not be paid for past or future work such that the statement could properly be treated as an anticipatory breach,[1] the factfinder reasonably could have interpreted this statement as an indication that the relationship between the two parties was breaking down. Additionally, the finder of fact rationally could have found the Contractor's solicitation of another painting bid during the second week of September to be inconsistent with an intention to continue to employ the Subcontractor.

The evidence shows that on September 23, the Martells showed up on the construction site and were, as both parties admit, ordered by Paul LaLiberte to leave, albeit politely. Against the background of tension and distrust between the parties indicated by the other evidence noted above, the trier of fact rationally could have interpreted this order to leave to be a permanent order not to return, which would constitute a material breach of the subcontract as a matter of law. It is well recognized that "[i]t is primarily for the factfinder to judge the credibility of witnesses and to consider the weight and significance of any other evidence. As such, we must give due regard to the trier of fact's determinations on credibility, weight and significance of evidence." *Tonge v. Waterville Realty Corp.*, 448 A.2d 902, 905 (Me.1982). Accordingly, the fact that other evidence was presented from which the Contractor can argue that the Subcontractor was ordered to leave the job site temporarily and only because the Martells were disturbing work by taking photographs did not compel the trial court to grant the Contractor's motions.

## III.

The Contractor also contends that the Superior Court erred by not granting its motion for a new trial. It is well established that,

> The scope of our review of a trial court's disposition of a motion for new trial is very limited. *"In deciding the correctness of the action taken by the presiding Justice [the Law Court] cannot substitute [its] judgment for his. His order may be reversed by [the Law Court] only 'in the event that a clear and manifest abuse of discretion on the part of the trial judge is shown.'* Chenell v. Westbrook College, Me., 324 A.2d 735, 737 (1974)."

*Binette v. Deane*, 391 A.2d 811, 813 (Me. 1978) (emphasis in original). "Upon a motion for a new trial, the movant *'must show that the jury verdict was so manifestly or clearly wrong that it is apparent that the conclusion of the jury was the result of prejudice, bias, passion, or a mistake of law.'* Id.* (quoting *Kennebec Towage Co. v. State*, 142 Me. 327, 334, 52 A.2d 166, 169 (1947)) (emphasis in *Binette*). In other words, *"[t]he verdict must stand unless there is found in the record no evidence to support it." Id.* (quoting *Larsen v. Lane*, 156 Me. 66, 68, 158 A.2d 759, 760 (1960)) (emphasis in *Binette*).

The evidence supports a finding that the Contractor terminated the subcontract on September 23rd, thereby breaching the subcontract. Further, the Contractor has failed to point to any specific indications that the jury's verdict was the result of prejudice, bias, passion, or mistake of law.

The entry is:

Judgment affirmed.

All concurring.

---

**1.** To constitute an anticipatory breach justifying the Subcontractor's renunciation of the entire subcontract, the Contractor's refusals to perform must have concerned obligations or promises "going to the whole consideration, and [they] must [have been] *distinct, unequivocal, and absolute."* 17 Am.Jur.2d *Contracts*, § 450 (emphasis added). *See also Listman Mill Co. v. Dufresne*, 111 Me. 104, 88 A. 354, 355 (1913) (renunciation of an executory contract by one party, to enable the other party either to accept the contract as entirely rescinded and sue immediately for damages or to wait and bring suit only when time for performance has arrived, must be "distinct and unequivocal," and not simply "an indication of an intention not to perform").